Michael A. Sirignano (MS 5263)
Barry I. Levy (BL 2190)
Frank P. Tiscione (FT 5396)
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Government Employees Insurance
Company, GEICO Indemnity Company, GEICO General
Insurance Company and GEICO Casualty Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
GOVERNMENT EMPLOYEES INSURANCE COMPANY,
GEICO INDEMNITY COMPANY, GEICO GENERAL
INSURANCE  COMPANY and GEICO CASUALTY
COMPANY,

                Plaintiffs,

          -against-

AZU AJUDUA, M.D., UTICA COMPREHENSIVE
MEDICAL, PC, NATASHA KELLY, M.D., EFFECTIVE
HEALTHCARE MEDICAL PC, BARRY DUBLIN, MD,
BD MEDICAL SERVICES PC, GRAIG GRANOVSKY,
DC, GLOBAL HEALTH CARE CHIROPRACTIC, PC,
GEORGE BISHAY, GS PHYSICAL THERAPY OFFICE,
PC, MEI LING BIGLEY, L.Ac., SUPER AM
ACUPUNCTURE PC., AHMED ABDELHADY, HABIBA
CARE PT, PC, KAI-HONG QIU, L.Ac., EAST PEARL
ACUPUNCTURE, PC, XU GAO, L.Ac., XU GAO
ACUPUNCTURE  PC, MAHMOUD EL SAYED, VISION
REHAB PT, PC,

          -and-

DIANA LURIE, IGOR FARBEROV and JOHN DOE
DEFENDANTS 1-10,

                Defendants.

------------------------------------------------------------------------X

15-cv-5199

Docket No.:_____ (    )

**Plaintiff Demands a Trial by
Jury**

## COMPLAINT

Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company (collectively "GEICO" or "Plaintiffs"), as and for their Complaint against the Defendants, hereby allege as follows:

## NATURE OF THE ACTION

1.      This action seeks to recover more than $2,610,000.00 that the Defendants wrongfully obtained from GEICO by submitting, and causing to be submitted, thousands of fraudulent no-fault insurance charges relating to medically unnecessary, illusory, and otherwise unreimbursable healthcare services, including bogus examinations, outcome assessment testing, physical performance testing, voltage-actuated sensory nerve conduction threshold testing, chiropractic services, acupuncture services, and physical therapy services (collectively, the "Fraudulent Services"), that allegedly were provided to New York automobile accident victims ("Insureds").

2.      The Fraudulent Services were the product of a two-pronged scheme perpetrated by Defendants.  First, unlicensed laypersons "bought" the licenses of healthcare professionals in order to fraudulently incorporate and control healthcare professional corporations and practices, which operated at a no-fault medical clinic located at 535 Utica Avenue, Brooklyn, New York (the "Utica Avenue Clinic").   Then, the unlicensed laypersons used their control of the professional corporations and medical practices to implement a fraudulent, predetermined treatment protocol administered to Insureds at the Utica Avenue Clinic in order to enrich themselves by exploiting the Insureds' no-fault benefits.

3.      As part of the fraudulent scheme, the Defendants billed GEICO for a laundry-list of high frequency and unnecessary treatments, using as "fronts" the licenses and tax identification numbers of an ever-changing number of healthcare professionals and professional

2

corporations.   In fact, GEICO received billing for alleged treatments to Insureds from a "revolving door" of more than 30 purportedly separate and distinct healthcare providers, though all actually operated at a single location under the control of the Management Defendants.

4.     In addition to damages, GEICO seeks a declaration that it is not legally obligated to pay reimbursement of more than $2,575,000.00 in pending no-fault insurance claims that have been submitted under the names of the following: Utica Comprehensive Medical, PC ("Utica Comprehensive"), Effective Healthcare Medical PC ("Effective Healthcare"), BD Medical Services PC ("BD Medical"), Global Health Care Chiropractic, PC ("Global Health"), GS Physical Therapy Office, PC ("GS PT"), Super AM Acupuncture, PC ("Super AM"), Habiba Care PT, PC ("Habiba Care"), East Pearl Acupuncture, PC ("East Pearl"), Xu Gao Acupuncture PC ("Xu Gao Acu"), Vision Rehab PT, PC ("Vision Rehab"), Azu Ajudua, M.D. ("Fraudulent Ajudua Practice"), Natasha Kelly, M.D. ("Fraudulent Kelly Practice"), and Graig Granovsky ("Fraudulent Granovsky Practice") (collectively the "Provider Defendants"), because:

(i)     the Provider Defendants were fraudulently incorporated, and/or unlawfully owned and controlled by unlicensed laypersons;

(ii)    the Provider Defendants submitted claims for Fraudulent Services that were not medically necessary and were provided – to the extent they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly are subjected to them;

(iii)   the billing codes used for the Fraudulent Services submitted under the names of the Provider Defendants misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO; and

(iv)    the Provider Defendants and their nominal owners unlawfully split fees with unlicensed individuals and entities.

5.     The Defendants fall into the following categories:

3

(i) The Provider Defendants are medical, acupuncture, physical therapy, and chiropractic professional corporations or unincorporated "practices" through which the Fraudulent Services purportedly were performed and billed to insurance companies, including GEICO.

(ii) Azu Ajudua, M.D. ("Dr. Ajudua"), Natasha Kelly, M.D. ("Dr. Kelly"), Barry Dublin, M.D. ("Dr. Dublin"), Graig Granovsky, DC ("Granovsky"), George Bishay ("Bishay"), Mei Ling Bigley, L.Ac. ("Bigley"), Ahmed Abdelhady ("Ahmed"), Kai Hong Qiu, L.Ac. ("Qiu"), Xu Gao ("Gao"), and Mahmoud El Sayed ("Mahmoud") (collectively the "Nominal Owner Defendants") are licensed medical professionals who falsely purport to own and control the Provider Defendants.

(iii) Defendants Diana Lurie ("Lurie") and Igor Farberov ("Farberov") are not licensed physicians, but they illegally own and control the Provider Defendants and spearheaded the fraudulent scheme committed against GEICO and other New York automobile insurers.

(iv) John Doe Defendants 1-10 are persons and entities who are presently not identifiable but are associated with the Provider Defendants, who are not licensed physicians, who illegally own and control the Provider Defendants, and who have been involved in the fraudulent scheme committed against GEICO and other New York automobile insurers, along with Lurie and Farberov. John Does Defendants 1-10, Lurie, and Farberov are collectively the "Management Defendants."

6. As discussed below, Defendants at all relevant times have known that:

(i) the Provider Defendants were fraudulently incorporated, and/or unlawfully owned and controlled by unlicensed laypersons and, therefore, were ineligible to bill for or to collect No-Fault Benefits;

(ii) the Fraudulent Services were not medically necessary and were provided – to the extent they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them;

(iii) the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO; and

(iv) the Provider Defendants and Nominal Owners unlawfully split fees with unlicensed individuals and entities and, therefore, the Provider Defendants were ineligible to bill for or to collect no-fault benefits.

4

7.     As such, the Defendants do not now have – and never had – any right to be compensated for the Fraudulent Services that have been billed to GEICO through the Provider Defendants.

8.     The charts annexed hereto as Exhibits "1" – "13" set forth a representative sample of the fraudulent claims that have been identified to-date that the Defendants have submitted, or caused to be submitted, to GEICO.

9.     The Defendants' fraudulent scheme began as early as 2011 and continues uninterrupted through present day.  As a result of the Defendants' scheme, GEICO has incurred damages of more than $2,610,000.00.

## THE PARTIES

**I.     Plaintiffs**

10.     Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company are Maryland corporations with their principal places of business in Chevy Chase, Maryland.   GEICO is authorized to conduct business and to issue automobile insurance policies in New York.

**II.    Defendants**

11.     Defendant Dr. Ajudua resides in and is a citizen of New York.  Dr. Ajudua was licensed to practice medicine in New York on April 22, 1977 and purports to own Defendant Utica Comprehensive.  Dr. Ajudua purported to examine patients through Utica Comprehensive and/or the Fraudulent Ajudua Practice at the Utica Avenue Clinic.

12.     Defendant Utica Comprehensive is a fraudulently incorporated New York medical professional corporation with its principal place of business at the Utica Avenue Clinic through which the Fraudulent Services have been billed to insurance companies, including

GEICO. Utica Comprehensive was fraudulently incorporated on January 26, 2011, and nominally owned on paper by Dr. Ajudua, but in actuality always has been owned and controlled by unlicensed laypersons in contravention of New York law.

13. Defendant Dr. Kelly resides in and is a citizen of New York. Dr. Kelly was licensed to practice medicine in New York on August 29, 2006 and purports to own Defendant Effective Healthcare. Dr. Kelly purported to examine patients through Effective Healthcare and/or the Fraudulent Kelly Practice at the Utica Avenue Clinic.

14. Defendant Effective Healthcare is a fraudulently incorporated New York medical professional corporation with its principal place of business at the Utica Avenue Clinic through which the Fraudulent Services have been billed to insurance companies, including GEICO. Effective was fraudulently incorporated on July 9, 2014, and nominally owned on paper by Dr. Kelly, but in actuality always has been owned and controlled by unlicensed laypersons in contravention of New York law.

15. Defendant Dr. Dublin resides in and is a citizen of New York. Dr. Dublin was licensed to practice medicine in New York on June 27, 1995 and purports to own Defendant BD Medical. Dr. Dublin purported to examine patients through BD Medical at the Utica Avenue Clinic.

16. Defendant BD Medical is a fraudulently incorporated New York medical professional corporation with its principal place of business at the Utica Avenue Clinic through which the Fraudulent Services have been billed to insurance companies, including GEICO. BD Medical was incorporated on March 19, 2010, and nominally owned on paper by Dr. Dublin, but in actuality always has been owned and controlled by unlicensed laypersons in contravention of New York law, at least since February 2015.

6

17.     Defendant Granovsky resides in and is a citizen of New York.  Granovsky was licensed to practice chiropractic in New York on September 7, 2007 and purports to own Defendant Global Health.  Granovsky purported to perform chiropractic manipulations and voltage-actuated sensory nerve conduction threshold testing through Global Health and/or the Fraudulent Granovsky Practice at the Utica Avenue Clinic.

18.     Defendant Global Health is a fraudulently incorporated New York chiropractic professional corporation with its principal place of business at the Utica Avenue Clinic, through which bogus voltage-actuated sensory nerve conduction threshold tests have been billed to insurance companies, including GEICO.  Global Health was fraudulently incorporated on July 7, 2009, and is nominally owned on paper by Granovsky, but in actuality always has been owned and controlled by unlicensed laypersons in contravention of New York law.

19.     Defendant Bishay resides in and is a citizen of New Jersey.  Bishay was licensed to practice physical therapy in New York on October 16, 2000 and purports to own Defendant GS PT.  Bishay purported to perform physical therapy on patients at the Utica Avenue Clinic.

20.     Defendant GS PT is a fraudulently incorporated New York healthcare professional corporation with its principal place of business at the Utica Avenue Clinic, through which physical therapy services have been billed to insurance companies, including GEICO.  GS PT was fraudulently incorporated on October 12, 2010, and nominally owned on paper by Bishay, but in actuality always has been owned and controlled by unlicensed laypersons in contravention of New York law.

21.     Defendant Bigley resides in and is a citizen of Connecticut.  Bigley was licensed to practice acupuncture in New York on July 9, 2002 and purports to own Defendant Super AM.

Bigley purported to perform acupuncture on patients at the Utica Avenue Clinic through Super AM.

22.     Defendant Super AM is a fraudulently incorporated New York acupuncture professional corporation with its principal place of business at the Utica Avenue Clinic, through which acupuncture treatment has been billed to insurance companies, including GEICO.  Super AM was fraudulently incorporated on January 18, 2012, and nominally owned on paper by Bigley, but in actuality has been fraudulently owned and controlled by unlicensed laypersons in contravention of New York law.

23.     Defendant Ahmed resides in and is a citizen of New York.  Ahmed was licensed to practice physical therapy in New York on July 14, 2008 and purports to own Defendant Habiba Care.  Ahmed purported to provide physical therapy on patients at the Utica Avenue Clinic through Habiba Care.

24.     Defendant Habiba Care is a fraudulently incorporated New York physical therapy professional corporation with its principal place of business at the Utica Avenue Clinic, through which the physical therapy services have been billed to insurance companies, including GEICO. Habiba Care was fraudulently incorporated on August 11, 2010, and nominally owned on paper by Ahmed, but in actuality always has been owned and controlled by unlicensed laypersons in contravention of New York law.

25.     Defendant Qiu resides in and is a citizen of New York.  Qi was licensed to practice acupuncture in New York on March 14, 1996 and purports to own Defendant East Pearl. Qi purported to provide acupuncture treatment on patients at the Utica Avenue Clinic through East Pearl.

26.     Defendant East Pearl is a fraudulently incorporated New York acupuncture professional corporation with its principal place of business at the Utica Avenue Clinic, through which the acupuncture services have been billed to insurance companies, including GEICO. East Pearl was fraudulently incorporated on December 28, 2010, and nominally owned on paper by Qiu, but in actuality always has been owned and controlled by unlicensed laypersons in contravention of New York law.

27.     Defendant Gao resides in and is a citizen of New York.  Gao was licensed to practice acupuncture in New York on May 22, 2012 and purports to own Defendant Xu Gao Acu.  Gao purported to provide acupuncture treatment on patients at the Utica Avenue Clinic through Xu Gao Acu.

28.     Defendant Xu Gao Acu is a fraudulently incorporated New York acupuncture professional corporation with its principal place of business at the Utica Avenue Clinic, through which the acupuncture services have been billed to insurance companies, including GEICO.  Xu Gao Acu was fraudulently incorporated on February 11, 2014, and nominally owned on paper by Gao, but in actuality always has been owned and controlled by unlicensed laypersons in contravention of New York law.

29.     Defendant Mahmoud resides in and is a citizen of New York.  Mahmoud was licensed to practice physical therapy in New York on April 3, 2007 and purports to own Vision Rehab.  Mahmoud purported to provide physical therapy services to patients at the Utica Avenue Clinic through Vision Rehab.

30.     Defendant Vision Rehab is a fraudulently incorporated New York physical therapy professional corporation with its principal place of business at the Utica Avenue Clinic, through which the physical therapy services have been billed to insurance companies, including

GEICO.  Vision Rehab was fraudulently incorporated on February 23, 2010, and nominally owned on paper by Mahmoud, but in actuality always has been owned and controlled by unlicensed laypersons in contravention of New York law.

31.   Defendant Lurie resides in and is a citizen of the State of New York.  Lurie has never been a licensed physician or medical professional, yet secretly owns, controls, and derives economic benefit from the operation of the Provider Defendants in contravention of New York law, as well as the treatments provided to Insureds at the Utica Avenue Clinic.

32.   Defendant Farberov resides in and is a citizen of New York.  Farberov has never been a licensed physician or medical professional, yet secretly owns, controls, and derives economic benefit from the operation of the Provider Defendants in contravention of New York law, as well as the treatments provided to Insureds at the Utica Avenue Clinic.

33.   John Doe Defendants 1 – 10 reside in and are citizens of New York. John Doe Defendants 1 – 10 are individuals and entities, presently not identifiable, who are not and never have been licensed medical professionals, yet – together with Lurie and Farberov– have owned, controlled, and derived economic benefit from the Provider Defendants in contravention of New York law, and have split fees with the Provider Defendants and Nominal Owners in contravention of New York law.

## JURISDICTION AND VENUE

34.   This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.  Pursuant to 28 U.S.C. § 1331, this Court also has jurisdiction over the claims brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ("RICO") Act) because they arise under the

laws of the United States.  In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

35.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where one or more of the Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS COMMON TO ALL CLAIMS

**I.      An Overview of the No-Fault Laws and Licensing Statutes**

36.     GEICO underwrites automobile insurance in New York.

37.     New York's No-Fault laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the healthcare services that they need.  Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101, et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65, et seq.)(collectively referred to as the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to Insureds.

38.     No-Fault Benefits include up to $50,000.00 per Insured for necessary expenses that are incurred for health care goods and services.

39.     An Insured can assign his or her right to No-Fault Benefits to the providers of healthcare services in exchange for those services.  Pursuant to a duly executed assignment, a healthcare provider may submit claims directly to an insurance company within forty-five days of the date of service and receive payment for medically necessary services, using the claim form required by the New York State Department of Insurance (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or more commonly as an "NF-3").

In the alternative, a healthcare provider may submit claims using the Health Care Financing Administration insurance claim form (known as the "HCFA-1500 Form").

40.    The No-Fault Laws obligate individuals and healthcare providers that seek payment of No-Fault Benefits to provide insurers with additional verification in order to establish proof of their claims.

41.    Pursuant to the No-Fault Laws, professional corporations are not eligible to bill for or collect No-Fault Benefits if they are fraudulently incorporated or violate material licensing requirements.

42.    In New York, only a licensed healthcare professional may: (i) practice the pertinent healthcare profession; (ii) own and control a professional corporation authorized to operate a professional healthcare practice; (iii) employ and supervise other healthcare professionals; and (iv) absent statutory exceptions not applicable in this case, derive economic benefit from healthcare professional services. Unlicensed individuals may not: (i) practice the pertinent healthcare profession; (ii) own or control a professional corporation authorized to operate a professional healthcare practice; (iii) employ or supervise healthcare professionals; or (iv) absent statutory exceptions not applicable in this case, derive economic benefit from professional healthcare services.

43.    In State Farm Mut. Auto. Ins. Co. v. Mallela, 4 N.Y.3d 313, 320 (2005), the New York Court of Appeals made clear that healthcare providers that fail to comply with licensing requirements are ineligible to collect No-Fault Benefits, and that insurers may look beyond a facially-valid license to determine whether there was a failure to abide by state and local law.

44.    Pursuant to the No-Fault Laws, health care service providers are not eligible to receive No-Fault Benefits if they engage in fee-splitting, which is prohibited by, inter alia, New York's Education Law.

45.    Pursuant to Education Law §6512, §6530 (11), (18), and (19), aiding and abetting an unlicensed person to practice a profession, offering any fee or consideration to a third party for the referral of a patient, and permitting any person not authorized to practice medicine to share in the fees for professional services is considered a crime and/or professional misconduct.

46.    Pursuant to Education Law § 6509-a, it is professional misconduct under certain circumstances for a licensed physician to "directly or indirectly" request, receive, or participate in the division, transference, assignment, rebate, splitting, or refunding of a fee.  Pursuant to Education Law §6530(19), it is professional misconduct under certain circumstances for a licensed physician to permit any person to share in fees for professional services.

47.    Additionally, New York law requires that the shareholders of a professional corporation be engaged in the practice of their profession through the professional corporation in order for it to be lawfully licensed.  Under the No-Fault Laws, professional corporations are not eligible to receive No-Fault Benefits if they are owned by professionals who do not engage in the practice of their profession through the professional corporation.

48.    The implementing regulation adopted by the Superintendent of Insurance, 11 NYCRR § 65-3.16(a)(12), provides, in pertinent part, as follows:

> A provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York … (emphasis supplied).

49.    Pursuant to the No-Fault Laws, only health care providers in possession of a direct assignment of benefits are entitled to bill for or collect No-Fault Benefits. There is both a

13

statutory and regulatory prohibition against payment of No-Fault Benefits to anyone other than the patient or his/her healthcare provider. The implementing regulation adopted by the Superintendent of Insurance, 11 NYCRR § 65-3.11, provides, in pertinent part, as follows:

> An insurer shall pay benefits for any element of loss …. <u>directly</u> to the applicant or, … upon assignment by the applicant …. shall pay benefits <u>directly</u> to providers of health care services as covered under section five thousand one hundred two (a)(1) of the Insurance Law… . (emphasis supplied).

50.     For a healthcare provider to be eligible to bill for and to collect charges from an insurer for healthcare services pursuant to N.Y. Ins. Law § 5102(a), it must be the actual provider of the service. Under the No-Fault Laws, a professional service corporation is not eligible to bill for services, or to collect for those services from an insurer, where the services were rendered by persons who are not employees of the professional corporation, such as independent contractors.

51.     Pursuant to N.Y. Ins. Law § 403, all bills submitted by a healthcare provider to GEICO and all other insurers must be verified by the healthcare provider subject to – in substance – the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime … .

## II.     The Defendants' Fraudulent Scheme

52.     Beginning in early 2011, Defendants masterminded and implemented a series of interrelated, complex fraudulent schemes wherein the Provider Defendants – owned on paper by the Nominal Owner Defendants, but actually illegally owned and controlled by the Management Defendants – were used to bill GEICO and the New York automobile insurance industry for millions of dollars in no-fault insurance benefits they were never entitled to receive.

53.   To effectuate the scheme, the Management Defendants controlled a multidisciplinary health care clinic, located at 535 Utica Avenue, Brooklyn, New York (i.e., the Utica Avenue Clinic), unlawfully owned and controlled the healthcare providers operating within the clinic, and established and directed a pre-determined, cookie-cutter treatment protocol to maximize profits without regard to genuine patient care.

54.   Though ostensibly organized to provide a range of health care services to Insureds at a single location, the clinic controlled by the Management Defendants was actually organized to be a convenient, one-stop shop for no-fault insurance fraud.

55.   Using the Utica Avenue Clinic as the center of their operations, the Management Defendants devised a complex fraudulent scheme which saw them: (i) "purchase" the licenses of the Nominal Owner Defendants; (ii) use those licenses to incorporate, own, and/or control the Provider Defendants; (iii) retain runners - individuals who, for pecuniary benefit, solicit patients at the direction of the Management Defendants - to help the Management Defendants build a patient base that they can subject to a pre-determined treatment protocol; (iv) engage in illegal kickback arrangements in order to submit additional billing to GEICO; and (vi) use the Provider Defendants as conduits to submit fraudulent no-fault billing to GEICO pursuant to the predetermined fraudulent treatment protocol they established.

56.   The Management Defendants retained the runners to solicit patients to the Utica Avenue Clinic, who initially "treated" with Utica Comprehensive, the Fraudulent Ajudua Practice, Effective Healthcare, the Fraudulent Kelly Practice, and/or BD Medical.   The patients, or Insureds, were then simultaneously or subsequently treated by a variety of other "adjunct" providers including Super AM, East Pearl, Xu Gao Acu, Global Health, GS PT, Habiba Care, Vision Rehab, and the Fraudulent Granovsky Practice, all at the Utica Avenue Clinic.

15

57.     In addition to the Provider Defendants named in this complaint, there have been many other healthcare providers and professional corporations that have billed GEICO rapidly and excessively for an array of healthcare services allegedly provided at the Utica Avenue Clinic.

58.     The "revolving door" of healthcare providers at the Utica Avenue Clinic has included at least two additional acupuncture professional corporations, five psychological professional corporations, six physical therapy professional corporations, seven chiropractic professional corporations, and ten transient diagnostic professional corporations.

59.     Notwithstanding the frequent change of professional corporations and healthcare providers at the Utica Avenue Clinic, the Fraudulent Services and the type and nature of the billings submitted to GEICO remained virtually the same.

60.     Notwithstanding the frequent change of professional corporations and healthcare providers at the Utica Avenue Clinic, there has never been any actual "sale," "transfer," or "dissolution" of a healthcare practice or professional corporation by any legitimate professional owner working at the clinic.

61.     The only constant at the Utica Avenue Clinic has been the Management Defendants, who have remained constant and firmly in control of all entities, healthcare services, and profits generated at the Utica Avenue Clinic.

A.      **The Fraudulent Incorporation and/or Operation of the Provider Defendants**

62.     As early as January 2011, the Management Defendants commenced a search for licensed professionals who would be willing to sell the use of their professional licenses to the Management Defendants so that the Management Defendants could either (i) fraudulently incorporate a professional corporation under the professional's name; (ii) illegally operate and control a professional corporation previously incorporated by the professional; or (iii) illegally

16

operate and control an unincorporated medical practice under the name of a licensed professional. The Management Defendants sought to purchase the use of these professional licenses in order to submit large-scale fraudulent no-fault billing to New York no-fault insurers.

63.    Beginning in 2011, the Management Defendants recruited Dr. Ajudua, Granovsky, Bishay, Bigley, Ahmed, Qiu, Dr. Kelly, Mahmoud, Gao, and Dr. Dublin, all licensed professionals who were willing to sell to the Management Defendants the use of their professional licenses, so that they could: (i) fraudulently incorporate professional corporations; (ii) illegally own and operate preexisting medical corporations; and/or (iii) illegally own and operate medical practices operated under the doctors' own individual tax identification numbers.

64.    Although the Nominal Owner Defendants are listed as the record owners of the Provider Defendants on the Certificates of Incorporation or appear to be the owners and operators of medical practices operated under their own names, the Nominal Owner Defendants exercised no ownership or control over the professional practices or the profits that were generated from the Provider Defendants.  Rather, the day-to-day operations, supervisory control, and true ownership of the Provider Defendants rested in the hands of the Management Defendants.

65.    The Nominal Owner Defendants did not establish their own practices, but rather walked into the Utica Avenue Clinic with a pre-existing patient base that was created and controlled by the Management Defendants.

66.    The Nominal Owner Defendants had no input or control over the "practice" that was created by the Management Defendants at the Utica Avenue Clinic, and all operations, financial and otherwise, were controlled and dictated by the Management Defendants.

67.    The Nominal Owner Defendants never sought to build their name recognition, or the name recognition of the Provider Defendants under which they operated, in order to draw in business and never made any legitimate effort to generate patients.

68.    Likewise, the Provider Defendants did not have any internet websites, did not advertise for patients, and did virtually nothing as would be expected of legitimate healthcare practices that sought to develop their reputation and attract patients.

69.    To be sure, the Nominal Owner Defendants and the Provider Defendants relied on the Management Defendants, as the Management Defendants themselves were the true owners and controllers of the healthcare practices operated under the names of the Provider Defendants.

70.    Indeed, in order to generate the Provider Defendants' patient base, the Management Defendants paid "runners," who solicited patients to treat at the Utica Avenue Clinic in return for kickbacks and financial incentives.

71.    The Management Defendants, after paying off the "runners" for patient referrals, thereafter paid drivers to ensure that at least some patients would be picked up and transported to the Utica Avenue Clinic to create a patient base, or the appearance of a patient base, for the Fraudulent Services billed to GEICO.

72.    Once patients arrived at the Utica Avenue Clinic for treatment, the Management Defendants dictated the medical services that each patient received from the Provider Defendants.

73.    Throughout the course of the Nominal Owner Defendants' relationship with the Management Defendants, all decision-making authority relating to the operation and management of the Provider Defendants was vested entirely with the Management Defendants. This includes control over the treatment protocols, the hiring of individuals who allegedly

performed the Fraudulent Services, the hiring of administrative employees, the control over how the services would be billed to insurers, including GEICO, and how the profits of the Provider Defendants were dispersed.  In reality, the Nominal Owner Defendants were never anything more than de facto employees of the Management Defendants.

74.    In addition to controlling the Fraudulent Services provided at the Utica Avenue Clinic, the Management Defendants similarly controlled all aspects of the Provider Defendants' finances.  The Management Defendants used this control to illegally split the fees generated by the treatments and retain the vast majority of revenue generated by the Provider Defendants.

**1.    The Fraudulent Ownership and Control of Utica Comprehensive**

75.    In early 2011, the Management Defendants recruited Dr. Ajudua, a licensed physician who was willing to sell them the use of his medical license so that they could fraudulently incorporate Utica Comprehensive and use that entity as the main medical practice at the Utica Avenue Clinic.

76.    In order to circumvent New York law and to induce the New York State Education Department to issue a certificate of authority authorizing Utica Comprehensive to operate a medical practice, the Management Defendants entered into a secret scheme with Dr. Ajudua. In exchange for a designated salary or other form of compensation from the Management Defendants, Dr. Ajudua agreed to falsely represent in the certificate of incorporation filed with the Education Department, and the biennial statements filed thereafter, that he was the true shareholder, director, and officer of Utica Comprehensive and that he truly owned, controlled, and practiced through the professional corporation.  Dr. Ajudua did this knowing that the professional corporation would be used to submit fraudulent billing to insurers.

19

77.     Once Utica Comprehensive was fraudulently incorporated on January 26, 2011, Dr. Ajudua ceded true beneficial ownership and control over the professional corporation to the Management Defendants.

78.     The Management Defendants – rather than Dr. Ajudua – provided all start-up costs and investment in Utica Comprehensive.  Dr. Ajudua did not incur any costs to establish Utica Comprehensive's practice, nor did he invest any money in the professional corporation he purportedly owned.

79.     Thereafter, the Management Defendants caused Utica Comprehensive to commence operations at the Utica Avenue Clinic – a location that the Management Defendants controlled.

80.     Dr. Ajudua never was the true shareholder, director, or officer of Utica Comprehensive, and never had any true ownership interest in or control over the professional corporation.  True ownership and control over Utica Comprehensive always rested entirely with the Management Defendants, who used the facade of Utica Comprehensive to do indirectly what they were forbidden from doing directly, namely: (i) employ medical professionals; (ii) control their practices; and (iii) charge for and derive an economic benefit from their services.

81.     Dr. Ajudua exercised absolutely no control over or ownership interest in Utica Comprehensive.  All decision-making authority relating to the operation and management of Utica Comprehensive was vested entirely with the Management Defendants.

82.     In addition, Dr. Ajudua never controlled or maintained any of Utica Comprehensive's books or records, including its bank accounts; never selected, directed, and/or controlled any of the individuals or entities responsible for handling any aspect of Utica Comprehensive's financial affairs; never hired or supervised any of Utica Comprehensive

employees or independent contractors; and was completely unaware of the most fundamental aspects of how Utica Comprehensive operated.

83.     Dr. Ajudua himself has a history of associating with various no-fault clinics for relatively short periods of time, rather than building, owning, and/or controlling a legitimate professional medical practice himself.

84.     Dr. Ajudua has purported to be the owner of, among others, Wellness Medical PC, Manhattan Avenue Medical PC, AAA Medical PC, Dr. Ajudua Medical PC, Hollis Novel Comprehensive PC, Edison Medical PC, Quest Medical PC, All City Medical PC, Azu A Ajudua, MD PLLC, Uzaa Medical PC, Woodhaven Comprehensive Medical PC, Brighton Medical Care PC, Utica Comprehensive, and the Fraudulent Ajudua Practice.  GEICO also has received billing under Dr. Ajudua's own social security number for no-fault charges at a number of the same locations where professional corporations have operated using Dr. Ajudua's name as the record owner.

85.     Tellingly, although Dr. Ajudua is, upon information and belief, 71 years old, Dr. Ajudua's name was used to incorporate four new professional corporations over the course of one year, from December 2013 to December 2014.

86.     In fact, as to one of these professional corporations, Brighton Medical Care, PC, Dr. Ajudua testified in a recent examination under oath conducted on June 26, 2015 that: (i) he never formed Brighton Medical Care, PC; (ii) he did not know why it was billing GEICO; (iii) he actually returned checks that were issued from insurance companies in the name of Brighton Medical Care, PC; (iv) he never signed any papers to incorporate Brighton Medical Care, PC even though his name is listed as the owner; and (v) he had no idea who actually filed the incorporation paperwork for Brighton Medical Care, PC.

21

2.       **The Fraudulent Operation and Control of Azu Ajudua, M.D.'s License**

87.      In or about late-2012, the Management Defendants grew concerned of the volume of billing being submitted under the name of Utica Comprehensive, and the rising suspicions of their fraudulent scheme, and thereafter used Dr. Ajudua's license in a different manner.

88.      Instead of fraudulently incorporating an additional medical corporation, the Management Defendants arranged to have Dr. Ajudua bill for services under his own social security number, rather than a corporate tax identification number.

89.      In order to circumvent New York law preventing unlicensed laypersons from practicing medicine and owning and controlling medical practices, the Management Defendants entered into a secret scheme with Dr. Ajudua.  In exchange for a designated salary or other form of compensation from the Management Defendants, Dr. Ajudua agreed to falsely represent that he truly owned and controlled the Fraudulent Ajudua Practice.  As with Utica Comprehensive, Dr. Ajudua did this knowing that the practice would be used to submit fraudulent billing to insurers.

90.      The Management Defendants – rather than Dr. Ajudua – provided all start-up costs and investment in the Fraudulent Ajudua Practice.  Dr. Ajudua did not incur any costs to establish the business's practice, nor did he invest any money in the business he purportedly owned.

91.      Thereafter, the Management Defendants caused the Fraudulent Ajudua Practice to commence operations at the Utica Clinic – a location that the Management Defendants controlled.

92.      Dr. Ajudua never had any true ownership interest in or control over the Fraudulent Ajudua Practice.  True ownership and control over the business always rested entirely with the Management Defendants, who used the facade of Azu Ajudua, M.D. to do indirectly what they were forbidden from doing directly, namely: (i) employ medical professionals; (ii) control their practices; and (iii) charge for and derive an economic benefit from their services.

22

93.     Dr. Ajudua exercised absolutely no control over or ownership interest in the Fraudulent Ajudua Practice.   All decision-making authority relating to the operation and management of the business was vested entirely with the Management Defendants.

94.     In addition, Dr. Ajudua never controlled or maintained any of the Fraudulent Ajudua Practice's books or records, including its bank accounts; never selected, directed, and/or controlled any of the individuals or entities responsible for handling any aspect of the business's financial affairs; never hired or supervised any of the business's employees or independent contractors; and was completely unaware of the most fundamental aspects of how the business operated.

95.     In keeping with the fact that Dr. Ajudua exercised no control over the practice being operated in his name, the treatment the Fraudulent Ajudua Practice purportedly performed at the Utica Clinic was the exact same treatment purportedly performed through Utica Comprehensive.

96.     Likewise, the Fraudulent Ajudua Practice used the exact same pre-printed forms for initial examinations, follow-up examinations, and outcome assessment testing that Utica Comprehensive used when performing those services.

### 3.     The Fraudulent Operation and Control of Natasha Kelly, M.D.'s License

97.     In or about late-2013, the Management Defendants decided to replace Dr. Ajudua, whose "practice," upon information and belief, aroused the suspicion of New York auto insurers.

98.     Accordingly, the Management Defendants recruited Dr. Kelly, another licensed physician, who was willing to sell them the use of her medical license so they could continue with their fraudulent scheme to own and control a medical practice at the Utica Avenue Clinic.

99.     Instead of fraudulently incorporating an additional medical corporation, the Management Defendants – as they did with the Fraudulent Ajudua Practice - arranged to have Dr. Kelly bill for services under her own social security number, rather than a corporate tax identification number.

100.     In order to circumvent New York law preventing unlicensed laypersons from practicing a profession and owning and controlling medical practices, the Management Defendants entered into a secret scheme with Dr. Kelly.  In exchange for a designated salary or other form of compensation from the Management Defendants, Dr. Kelly agreed to falsely represent that she truly owned and controlled the Fraudulent Kelly Practice.  Dr. Kelly did this knowing that the practice would be used to submit fraudulent billing to insurers.

101.     The Management Defendants – rather than Dr. Kelly – provided all start-up costs and investment in the Fraudulent Kelly Practice.  Dr. Kelly did not incur any costs to establish the business's practice, nor did she invest any money in the business she purportedly owned.

102.     Thereafter, the Management Defendants caused the Fraudulent Kelly Practice to commence operations at the Utica Avenue Clinic – a location that the Management Defendants controlled.

103.     Dr. Kelly never had any true ownership interest in or control over the Fraudulent Kelly Practice.  True ownership and control over the business always rested entirely with the Management Defendants, who used the facade of Natasha Kelly, M.D. to do indirectly what they were forbidden from doing directly, namely: (i) employ medical professionals; (ii) control their practices; and (iii) charge for and derive an economic benefit from their services.

104. Dr. Kelly exercised absolutely no control over or ownership interest in the Fraudulent Kelly Practice. All decision-making authority relating to the operation and management of the business was vested entirely with the Management Defendants.

105. In addition, Dr. Kelly never controlled or maintained any of the Fraudulent Kelly Practice's books or records, including its bank accounts; and never selected, directed, and/or controlled any of the individuals or entities responsible for handling any aspect of the business's financial affairs.

106. In keeping with the fact that Dr. Kelly exercised no control over the practice being operated in her name, the treatment the Fraudulent Kelly Practice purportedly performed at the Utica Avenue Clinic was the exact same treatment purportedly performed through Utica Comprehensive and the Fraudulent Ajudua Practice.

107. Likewise, the Fraudulent Kelly Practice: (i) used substantially similar template forms for initial and follow-up examination reports; (ii) offered substantially similar boilerplate diagnoses; and (iii) referred Insureds for virtually the same Fraudulent Services as the Fraudulent Ajudua Practice and Utica Comprehensive.

108. GEICO conducted an Examination Under Oath ("EUO") of Dr. Kelly on January 19, 2015, in which Dr. Kelly gave testimony, which confirmed her "nominal" ownership of the Fraudulent Kelly Enterprise. For example, Dr. Kelly gave testimony indicating, among other things, that:

- Dr. Kelly took over as "medical director" of Utica Comprehensive in December 2013, yet paid no money to Dr. Ajudua. Meanwhile, Utica Comprehensive had stopped treating patients in December 2012;

- Dr. Kelly, after stating she started working at Utica Comprehensive as "Medical Director," then testified, "I don't know what it means" when asked what medical director meant to her.

- Dr. Kelly claims she was an employee of Utica Comprehensive who was paid by Diana Lurie, the office manager, until March 2014;

- The staff remained the same when Dr. Kelly came to the Utica Clinic;

- Dr. Kelly did not hire any staff or employees;

- Dr. Kelly acknowledged, but could not coherently explain, that some staff were actually on the payroll for Vision Rehab, including drivers who transport Insureds to the Utica Clinic;

- Dr. Kelly had no idea why Vision Rehab was paying certain employees;

- Dr. Kelly testified that Emric Management, which is owned by Emmanuel Richards, conducted her billing, however Emric Management has been dissolved by proclamation since October 28, 2009;

- From December 2013 to October 2014, Dr. Kelly failed to make any rent payments because the rent was purportedly paid by Utica Comprehensive – but Dr. Kelly never reimbursed Dr. Ajudua for these rent payments;

- Sublease rental payments made to Dr. Kelly were delivered to the front desk staff and deposited into the bank by the drivers, not Dr. Kelly;

- Dr. Kelly did not know how Ms. Lurie attracted professional corporations to the Utica Clinic for leasing space;

- At least 80-90% of Dr. Kelly's patients were referred for acupuncture, chiropractic, and range of motion testing;

- 100% of her patients were referred to the physical therapy corporation Vision Rehab - now purportedly called Enjoy Rehab PT, PC  which are both purportedly owned by Mahmoud;

- Neither Vision Rehab nor Enjoy Rehab PT, PC paid rent to Dr. Kelly supposedly because they employed the administrative staff – though Dr. Kelly did not why the staff was paid that way.

109.    Notwithstanding the nominal ownership by Dr. Kelly, Dr. Kelly – like the other Nominal Owner Defendants – is nothing more than a glorified employee of the Management Defendants.

**4.      The Fraudulent Ownership and Control of Effective Healthcare**

110.    In mid-July 2014, the Management Defendants recognized that suspicions were starting to build regarding the billing submitted under Dr. Kelly's individual social security number.  Accordingly, the Management Defendants then arranged to have Dr. Kelly sell them the use of her medical license so that they could fraudulently incorporate Effective Healthcare.

111.    In order to circumvent New York law and to induce the New York State Education Department to issue a certificate of authority authorizing Effective Healthcare to operate a medical practice, the Management Defendants entered into a secret scheme with Dr. Kelly.  In exchange for a designated salary or other form of compensation from the Management Defendants, Dr. Kelly agreed to falsely represent in the certificate of incorporation filed with the Education Department, and the biennial statements filed thereafter, that she was the true shareholder, director, and officer of Effective Healthcare and that she truly owned, controlled, and practiced through the professional corporation.  Dr. Kelly did this knowing that the professional corporation would be used to submit fraudulent billing to insurers.

112.    Once Effective Healthcare was fraudulently incorporated on July 9, 2014, Dr. Kelly ceded true beneficial ownership and control over the professional corporation to the Management Defendants.

113.    The Management Defendants – rather than Dr. Kelly – provided all start-up costs and investment in Effective Healthcare.  Dr. Kelly did not incur any costs to establish Effective Healthcare's practice, nor did she invest any money in the professional corporation she purportedly owned.

114.    Thereafter, the Management Defendants caused Effective Healthcare to commence operations at the Utica Avenue Clinic – a location that the Management Defendants controlled.

115.   Dr. Kelly never was the true shareholder, director, or officer of Effective Healthcare, and never had any true ownership interest in or control over the professional corporation.  True ownership and control over Effective Healthcare always rested entirely with the Management Defendants, who used the facade of Effective Healthcare to do indirectly what they were forbidden from doing directly, namely: (i) employ medical professionals; (ii) control their practices; and (iii) charge for and derive an economic benefit from their services.

116.   Dr. Kelly exercised absolutely no control over or ownership interest in Effective Healthcare.  All decision-making authority relating to the operation and management of Effective Healthcare was vested entirely with the Management Defendants.

117.   In addition, Dr. Kelly never controlled or maintained any of Effective Healthcare's books or records, including its bank accounts; never selected, directed, and/or controlled any of the individuals or entities responsible for handling any aspect of Effective Healthcare's financial affairs; never hired or supervised any of Effective Healthcare's employees or independent contractors; and was completely unaware of the most fundamental aspects of how Effective Healthcare operated.

**5.     The Fraudulent Ownership and Control of BD Medical**

118.   In early 2015, the Management Defendants recruited another doctor to replace Dr. Kelly so that they could continue their fraudulent billing scheme.  They recruited Dr. Dublin, a licensed physician who was willing to sell them the use of his medical license as well as complete ownership and control of a preexisting medical professional corporation, BD Medical, formed in 2010.

119.   In order to circumvent New York law preventing unlicensed laypersons from owning and controlling medical professional corporations, the Management Defendants entered

28

into a secret scheme with Dr. Dublin, wherein, in exchange for a designated salary or other form of compensation, Dr. Dublin agreed to falsely represent in the biennial statements filed with the Education Department, that he remained the true shareholder, director, and officer of BD Medical and that he truly owned, controlled, and practiced through the professional corporation. Dr. Dublin did this knowing that the professional corporation would be used to submit fraudulent billing to insurers.

120.    The Management Defendants – rather than Dr. Dublin – provided all costs associated with establishing BD Medical in the Utica Avenue Clinic controlled by the Management Defendants and all investment in BD Medical.  Dr. Dublin did not incur any costs to establish BD Medical's practice at the clinic, nor did he invest any money in the professional corporation he purportedly owned.

121.    Thereafter, the Management Defendants caused BD Medical to commence operations at the Utica Avenue Clinic, alongside other professional corporations that the Management Defendants controlled at this location.

122.    Beginning no later than May 2015, Dr. Dublin was not the true shareholder, director, or officer of BD Medical, and had no true ownership interest in or control over the professional corporation. True ownership and control over BD Medical rested thereafter entirely with the Management Defendants, who used the facade of BD Medical to do indirectly what they were forbidden from doing directly, namely: (i) employ medical professionals; (ii) control their practices; and (iii) charge for and derive an economic benefit from their services.

123.    Dr. Dublin exercised absolutely no control over or ownership interest in BD Medical. All decision-making authority relating to the operation and management of BD Medical was vested entirely with the Management Defendants.

124.    Dr. Dublin did not control or maintain any of BD Medical's books or records, including its bank accounts; never selected, directed, and/or controlled any of the individuals or entities responsible for handling any aspect of BD Medical's financial affairs; never hired or supervised any of BD Medical's employees or independent contractors; and was completely unaware of the most fundamental aspects of how BD Medical operated.

125.    Dr. Dublin's "sale" of his medical license and control of BD Medical to the Management Defendants, not surprisingly, coordinated with the BD Medical's billing and treatment protocol falling in lockstep with the prior medical practices that had operated at the Utica Avenue Clinic.

126.    Dr. Dublin himself has been no stranger to no-fault insurance fraud schemes, and has been named as a defendant in multiple insurance fraud actions.

127.    Dr. Dublin also has a history of being associated with various no-fault clinics for relatively short periods of time, rather than building, owning, and/or controlling a legitimate professional medical practice himself.

128.    Dr. Dublin has purported to provide services under the names of dozens of different entities that have submitted no-fault charges to GEICO, including:  Dublin Medical PC, Fountain Medical PC, SIN Medical PC, Shaker Hills Medical, PC, Apex Medical Diagnostic PC, Max Way Medical, PC, Renpier Central Medical PC, Skillman Medical Diagnostics PC, East Brook Diagnostics Medical PC, Medical Impressions Diagnostic PC, Avenue U Medical Care PC, O&M Medical PC, Empire Diagnostic Medical PC, Sunny Medical Care of NY, PC, Essential Medical Care, PC, FMF Medical PC, Lion Medical PC, Prime Diagnostic Medical PC, Max Jean Gilles MD PC, Accurate Medical Diagnostic PC, Lemonti Medical PC, MDJ Medical PC, Recover

Medical Services PC, Rawsol Medical Services LLC, Flatlands Medical PC, Heal Me Medical PC, Sutphin Complete Medical Care, PC, Tahir Medical PC.

129.    Many of the professional corporations that Dr. Dublin has purported to provide services for or on behalf of have been named as defendants in insurance fraud actions, and at least one (Accurate Medical PC) has been identified by the United States Government as being used as part of a massive scheme to defraud New York automobile insurance companies of hundreds of millions of dollars. See United States of America v. Zemlyansky, 12-CR-00171 (S.D.N.Y. 2012) (JPO).

**6.    The Fraudulent Ownership and Control of GS PT**

130.    The Defendants' scheme included billing for an array of bogus and predetermined adjunct healthcare services in addition to the services purportedly provided by the main medical practitioners that the Management Defendants controlled at the Utica Avenue Clinic.

131.    In 2011, the Management Defendants recruited Bishay, a licensed physical therapist who was willing to sell them the use of his physical therapy license as well as complete ownership and control of GS PT, a preexisting physical therapy professional corporation formed in 2010.

132.    In order to circumvent New York law preventing unlicensed laypersons from owning and controlling medical professional corporations, the Management Defendants entered into a secret scheme with Bishay, wherein, in exchange for a designated salary or other form of compensation, Bishay agreed to falsely represent in the biennial statements filed with the Education Department that Bishay remained the true shareholder, director, and officer of GS PT and that he truly owned, controlled, and practiced through the professional corporation. Bishay did this knowing that the professional corporation would be used to submit fraudulent billing to insurers.

31

133.    The Management Defendants – rather than Bishay – provided all costs associated with establishing GS PT in the Utica Avenue Clinic controlled by the Management Defendants, and all investment in GS PT subsequent to the purchase of Bishay's physical therapy license by the Management Defendants in mid-2011.  Bishay did not incur any costs to establish GS PT's practice, nor did he invest any money in the professional corporation he purportedly owned.

134.    Thereafter, the Management Defendants caused GS PT to commence operations at the Utica Clinic location that the Management Defendants controlled.

135.    Bishay was not the true shareholder, director, or officer of GS PT and had no true ownership interest in or control over the professional corporation.  Subsequent to the purchase of Bishay's physical therapy license, true ownership and control over GS PT always rested entirely with the Management Defendants, who used the facade of GS PT to do indirectly what they were forbidden from doing directly, namely: (i) employ medical professionals; (ii) control their practices; and (iii) charge for and derive an economic benefit from their services.

136.    Bishay exercised absolutely no control over or ownership interest in GS PT.  All decision-making authority relating to the operation and management of GS PT was vested entirely with the Management Defendants.

137.    In addition, Bishay did not control or maintain any of GS PT's books or records, including its bank accounts; never selected, directed, and/or controlled any of the individuals or entities responsible for handling any aspect of GS PT's financial affairs; never hired or supervised any of GS PT employees or independent contractors; and was completely unaware of the most fundamental aspects of how GS PT operated.

### 7.    The Fraudulent Ownership and Control of Habiba Care

138.    In mid-2012, the Management Defendants replaced Bishay and GS PT by recruiting Ahmed, a licensed physical therapist who was willing to sell them the use of his physical therapy license as well as complete ownership and control of Habiba Care, a preexisting physical therapy professional corporation formed in 2010.

139.    In order to circumvent New York law preventing unlicensed laypersons from owning and controlling medical professional corporations, the Management Defendants entered into a secret scheme with Ahmed, wherein, in exchange for a designated salary or other form of compensation, Ahmed agreed to falsely represent in the biennial statements filed with the Education Department, that he remained the true shareholder, director, and officer of Habiba Care and that he truly owned, controlled, and practiced through the professional corporation.  Ahmed did this knowing that the professional corporation would be used to submit fraudulent billing to insurers.

140.    The Management Defendants – rather than Ahmed – provided all costs associated with establishing Habiba Care in the Utica Avenue Clinic controlled by the Management Defendants, and all investment in Habiba Care subsequent to the purchase of Ahmed's physical therapy license by the Management Defendants in mid-2012.  Ahmed did not incur any costs to establish Habiba Care's practice, nor did he invest any money in the professional corporation he purportedly owned.

141.    Thereafter, the Management Defendants caused Habiba Care to commence operations at the Utica Avenue Clinic, alongside other professional corporations that the Management Defendants controlled at this location.

142.    Ahmed was not the true shareholder, director, or officer of Habiba Care, and had no true ownership interest in or control over the professional corporation. True ownership and control over Habiba Care always rested entirely with the Management Defendants, who used the facade of Habiba Care to do indirectly what they were forbidden from doing directly, namely: (i) employ medical professionals; (ii) control their practices; and (iii) charge for and derive an economic benefit from their services.

143.    Ahmed exercised absolutely no control over or ownership interest in Habiba Care. All decision-making authority relating to the operation and management of Habiba Care was vested entirely with the Management Defendants.

144.    Ahmed did not control or maintain any of Habiba Care's books or records, including its bank accounts; never selected, directed, and/or controlled any of the individuals or entities responsible for handling any aspect of Habiba Care's financial affairs; never hired or supervised any of Habiba Care employees or independent contractors; and was completely unaware of the most fundamental aspects of how Habiba Care operated.

**8.    The Fraudulent Ownership and Control of Vision Rehab**

145.    After exploiting GS PT and Habiba Care, in early 2013, the Management Defendants recruited Mahmoud, another licensed physical therapist, who was willing to sell them the use of his physical therapy license as well as complete ownership and control of Vision Rehab, a preexisting physical therapy professional corporation formed in 2010.

146.    In order to circumvent New York law preventing unlicensed laypersons from owning and controlling medical professional corporations, the Management Defendants entered into a secret scheme with Mahmoud, wherein, in exchange for a designated salary or other form of compensation, Mahmoud agreed to falsely represent in the biennial statements filed with the

Education Department, that he remained the true shareholder, director, and officer of Vision Rehab and that he truly owned, controlled, and practiced through the professional corporation. Mahmoud did this knowing that the professional corporation would be used to submit fraudulent billing to insurers.

147.   The Management Defendants – rather than Mahmoud – provided all costs associated with establishing Vision Rehab in the Utica Clinic controlled by the Management Defendants and all investment in Vision Rehab. Mahmoud did not incur any costs to establish Vision Rehab's practice, nor did he invest any money in the professional corporation he purportedly owned.

148.   Thereafter, the Management Defendants caused Vision Rehab to commence operations at the Utica Clinic, alongside other professional corporations that the Management Defendants controlled at this location.

149.   Mahmoud was not the true shareholder, director, or officer of Vision Rehab, and had no true ownership interest in or control over the professional corporation. True ownership and control over Vision Rehab always rested entirely with the Management Defendants, who used the facade of Vision Rehab to do indirectly what they were forbidden from doing directly, namely: (i) employ medical professionals; (ii) control their practices; and (iii) charge for and derive an economic benefit from their services.

150.   Mahmoud exercised absolutely no control over or ownership interest in Vision Rehab. All decision-making authority relating to the operation and management of Vision Rehab was vested entirely with the Management Defendants.

151.   Mahmoud did not control or maintain any of Vision Rehab's books or records, including its bank accounts; never selected, directed, and/or controlled any of the individuals or

entities responsible for handling any aspect of Vision Rehab's financial affairs; never hired or supervised any of Vision Rehab employees or independent contractors; and was completely unaware of the most fundamental aspects of how Vision Rehab operated.

### 9.     The Fraudulent Ownership and Control of Super AM

152.    In early 2012, the Management Defendants expanded their fraudulent scheme with acupuncture by recruiting Bigley, a licensed acupuncturist who was willing to sell them the use of her acupuncture license so that they could fraudulently incorporate Super AM.

153.    In order to circumvent New York law and to induce the New York State Education Department to issue a certificate of authority authorizing Super AM to operate an acupuncture practice, the Management Defendants entered into a secret scheme with Bigley.  In exchange for a designated salary or other form of compensation from the Management Defendants, in early 2012 Bigley agreed to falsely represent in the certificate of incorporation filed with the Education Department, and the biennial statements filed thereafter, that she was the true shareholder, director, and officer of Super AM and that she truly owned, controlled, and practiced through the professional corporation.  Bigley did this knowing that the professional corporation would be used to submit fraudulent billing to insurers.

154.    Once Super AM was fraudulently incorporated on January 18, 2012, Bigley ceded true beneficial ownership and control over the professional corporation to the Management Defendants.

155.    The Management Defendants – rather than Bigley – provided all start-up costs and investment in Super AM.  Bigley did not incur any costs to establish Super AM's practice, nor did she invest any money in the professional corporation she purportedly owned.

156.    Thereafter, the Management Defendants caused Super AM to commence operations at the Utica Avenue Clinic – a location the Management Defendants controlled.

157.    Bigley never was the true shareholder, director, or officer of Super AM, and never had any true ownership interest in or control over the professional corporation. True ownership and control over Super AM always rested entirely with the Management Defendants, who used the facade of Super AM to do indirectly what they were forbidden from doing directly, namely: (i) employ medical professionals; (ii) control their practices; and (iii) charge for and derive an economic benefit from their services.

158.    Bigley exercised absolutely no control over or ownership interest in Super AM. All decision-making authority relating to the operation and management of Super AM was vested entirely with the Management Defendants.

159.    In addition, Bigley never controlled or maintained any of Super AM's books or records, including its bank accounts; never selected, directed, and/or controlled any of the individuals or entities responsible for handling any aspect of Super AM's financial affairs; never hired or supervised any of Super AM employees or independent contractors; and was completely unaware of the most fundamental aspects of how Super AM operated.

160.    Bigley herself has a history of working at various no-fault clinics for relatively short periods of time, rather than building, owning, and/or controlling a legitimate professional practice herself.  In addition to Super AM, Bigley has been associated with at least Bigley Acupuncture PC, Good Energy PC, FYZ Acupuncture PC, L&G Acupuncture PC, L&S Acupuncture PC, many of which have been the subject of fraud concerns by GEICO.

**10.     The Fraudulent Ownership and Control of East Pearl**

161.     In early 2013, the Management Defendants recruited another acupuncturist to expand their acupuncture fraudulent billing scheme.  They recruited Qiu, a licensed acupuncturist who was willing to sell them the use of her acupuncture license as well as complete ownership and control of East Pearl that was formed in 2010.

162.     In order to circumvent New York law preventing unlicensed laypersons from owning and controlling medical professional corporations, the Management Defendants entered into a secret scheme with Qiu, wherein, in exchange for a designated salary or other form of compensation, Qui agreed to falsely represent in the biennial statements filed with the Education Department, that she remained the true shareholder, director, and officer of East Pearl and that she truly owned, controlled, and practiced through the professional corporation. Qiu did this knowing that the professional corporation would be used to submit fraudulent billing to insurers.

163.     The Management Defendants – rather than Qiu – provided all costs associated with establishing East Pearl in the Utica Clinic controlled by the Management Defendants, and all investment in East Pearl subsequent to the purchase of Qiu's acupuncture license by the Management Defendants in early 2013. Qiu did not incur any costs to establish East Pearl's practice, nor did she invest any money in the professional corporation she purportedly owned.

164.     Thereafter, the Management Defendants caused East Pearl to commence operations at the Utica Clinic, alongside other professional corporations that the Management Defendants controlled at this location.

165.     Qiu was not the true shareholder, director, or officer of East Pearl, and had no true ownership interest in or control over the professional corporation. True ownership and control over East Pearl always rested entirely with the Management Defendants, who used the facade of East

Pearl to do indirectly what they were forbidden from doing directly, namely: (i) employ medical professionals; (ii) control their practices; and (iii) charge for and derive an economic benefit from their services.

166.    Qiu exercised absolutely no control over or ownership interest in East Pearl. All decision-making authority relating to the operation and management of East Pearl was vested entirely with the Management Defendants.

167.    Qiu did not control or maintain any of East Pearl's books or records, including its bank accounts; never selected, directed, and/or controlled any of the individuals or entities responsible for handling any aspect of East Pearl's financial affairs; never hired or supervised any of East Pearl employees or independent contractors; and was completely unaware of the most fundamental aspects of how East Pearl operated.

**11.    The Fraudulent Ownership and Control of Xu Gao Acu**

168.    In furtherance of their scheme, the Management Defendants recruited another acupuncturist, Gao, who was willing to sell them the use of his acupuncture license as well as complete ownership and control of Xu Gao Acu that was formed in 2014.

169.    In order to circumvent New York law preventing unlicensed laypersons from owning and controlling medical professional corporations, the Management Defendants entered into a secret scheme with Gao, wherein, in exchange for a designated salary or other form of compensation, Gao agreed to falsely represent in the biennial statements filed with the Education Department, that he remained the true shareholder, director, and officer of Xu Gao Acu and that he truly owned, controlled, and practiced through the professional corporation. Gao did this knowing that the professional corporation would be used to submit fraudulent billing to insurers.

170.    The Management Defendants – rather than Gao – provided all costs associated with establishing Xu Gao Acu in the Utica Avenue Clinic controlled by the Management Defendants, and all investment in Xu Gao Acu subsequent to the purchase of Gao's acupuncture license by the Management Defendants in early 2013. Gao did not incur any costs to establish Xu Gao Acu's practice, nor did he invest any money in the professional corporation he purportedly owned.

171.    Thereafter, the Management Defendants caused Xu Gao Acu to commence operations at the Utica Avenue Clinic, alongside other professional corporations that the Management Defendants controlled at this location.

172.    Gao was not the true shareholder, director, or officer of Xu Gao Acu, and had no true ownership interest in or control over the professional corporation. True ownership and control over Xu Gao Acu always rested entirely with the Management Defendants, who used the facade of Xu Gao Acu to do indirectly what they were forbidden from doing directly, namely: (i) employ medical professionals; (ii) control their practices; and (iii) charge for and derive an economic benefit from their services.

173.    Gao exercised absolutely no control over or ownership interest in Xu Gao Acu. All decision-making authority relating to the operation and management of Xu Gao Acu was vested entirely with the Management Defendants.

174.    Gao did not control or maintain any of Xu Gao Acu's books or records, including its bank accounts; never selected, directed, and/or controlled any of the individuals or entities responsible for handling any aspect of Xu Gao Acu's financial affairs; never hired or supervised any of Xu Gao Acu's employees or independent contractors; and was completely unaware of the most fundamental aspects of how Xu Gao Acu operated.

**12.      The Fraudulent Ownership and Control of Global Health**

175.     In mid-2013, the Management Defendants decided to expand into chiropractic and diagnostic testing.   As such, the Management Defendants recruited Granovsky, a licensed chiropractor who was willing to sell the use of his chiropractic license as well as complete ownership and control of Global Health, a preexisting professional corporation formed in 2009.

176.     In order to circumvent New York law preventing unlicensed laypersons from owning and controlling medical professional corporations, the Management Defendants entered into a secret scheme with Granovsky, wherein, in exchange for a designated salary or other form of compensation, Granovsky agreed to falsely represent in the biennial statements filed with the Education Department, that he remained the true shareholder, director, and officer of Global Health and that he truly owned, controlled, and practiced through the professional corporation.

177.     The Management Defendants – rather than Granovsky – provided all costs associated with establishing Global Health in the Utica Clinic controlled by the Management Defendants and all investment in Global Health.   Granovsky did not incur any costs to establish Global Health's practice, nor did he invest any money in the professional corporation he purportedly owned.

178.     Thereafter, the Management Defendants caused Global Health to commence operations at the Utica Clinic, alongside other professional corporations that the Management Defendants controlled at this location.

179.     Granovsky was not the true shareholder, director, or officer of Global Health, and had no true ownership interest in or control over the professional corporation. True ownership and control over Global Health always rested entirely with the Management Defendants, who used the facade of Global Health to do indirectly what they were forbidden from doing directly, namely: (i)

employ medical professionals; (ii) control their practices; and (iii) charge for and derive an economic benefit from their services.

180.    Granovsky exercised absolutely no control over or ownership interest in Global Health. All decision-making authority relating to the operation and management of Global Health was vested entirely with the Management Defendants.

181.    Granovsky did not control or maintain any of Global Health's books or records, including its bank accounts; never selected, directed, and/or controlled any of the individuals or entities responsible for handling any aspect of Global Health's financial affairs; never hired or supervised any of Global Health employees or independent contractors; and was completely unaware of the most fundamental aspects of how Global Health operated.

### 13.    The Fraudulent Operation and Control of Graig Granovsky's License

182.    Once again, to conceal and further their scheme, the Management Defendants also arranged to have Granovsky bill for services under his own social security number, rather than a corporate tax identification number.

183.    In order to circumvent New York law preventing unlicensed laypersons from practicing a licensed profession and owning and controlling medical practices, the Management Defendants entered into a secret scheme with Granovsky.  In exchange for a designated salary or other form of compensation from the Management Defendants, Granovsky agreed to falsely represent that he truly owned and controlled the Fraudulent Granovsky Practice.  Granovsky did this knowing that the practice would be used to submit fraudulent billing to insurers.

184.    The Management Defendants – rather than Granovsky – provided all start-up costs and investment in the Fraudulent Granovsky Practice.  Granovsky did not incur any costs to

establish the business's practice, nor did he invest any money in the business he purportedly owned.

185.    Thereafter, the Management Defendants caused the Fraudulent Granovsky Practice to commence operations at the Utica Avenue Clinic – a location that the Management Defendants controlled.

186.    Granovsky never had any true ownership interest in or control over the Fraudulent Granovsky Practice.  True ownership and control over the business always rested entirely with the Management Defendants, who used the facade of Graig Granovsky, D.C. to do indirectly what they were forbidden from doing directly, namely: (i) employ medical professionals; (ii) control their practices; and (iii) charge for and derive an economic benefit from their services.

187.    Granovsky exercised absolutely no control over or ownership interest in the Fraudulent Granovsky Practice.  All decision-making authority relating to the operation and management of the business was vested entirely with the Management Defendants.

188.    In addition, Granovsky never controlled or maintained any of the Fraudulent Granovsky Practice's books or records, including its bank accounts; never selected, directed, and/or controlled any of the individuals or entities responsible for handling any aspect of the business's financial affairs; never hired or supervised any of the business's employees or independent contractors; and was completely unaware of the most fundamental aspects of how the business operated.

B.     **The Management Defendants' Efforts to Conceal Their Ownership and Control of the Provider Defendants By Imposing Sham Financial Arrangements**

189.   The Management Defendants used each of the Provider Defendants as vehicles so that they could illegally profit from professional medical services, unlawfully split fees, and funnel large sums of money to themselves in contravention of New York law.

190.   To conceal their illegal fee splitting, kickback, referral relationships, and true ownership and control of the Provider Defendants while simultaneously effectuating pervasive, total control over their operation and management, the Management Defendants arranged to have the Nominal Owner Defendants and the Provider Defendants enter into a series of "management," "billing," "collection," "transportation," "lease," and/or "marketing" agreements or other financial arrangements.

191.   These agreements or financial arrangements called for payments that were purportedly for the performance of certain designated services including management, marketing, billing, collections, leasing, etc., but were in actuality (i) sham agreements and arrangements; (ii) not reflective of the fair market value or the actual value of the services provided; and (iii) decoys to conceal the Management Defendants' illegal ownership and control over the Provider Defendants.

192.   In fact, the agreements and financial arrangements were created, dictated, and imposed by the Management Defendants upon the Provider Defendants to present the illusion that the Provider Defendants were paying legitimate fees for "management," "billing," "collection," "transportation," and "marketing" services, and/or for facility space and equipment, but they actually were used solely as a tool to permit the Management Defendants to: (i) control the day-to-day operations, exercise supervisory authority over, and illegally own the Provider

Defendants and (ii) to siphon all of the profits that were generated by the billings submitted to GEICO and other insurers through the Provider Defendants.

193.    The net effect of these "management", "billing", "collection," "transportation," "marketing," "lease," and/or other financial arrangements, was to maintain the Provider Defendants in a constant state of debt to the Management Defendants, thereby enabling the Management Defendants to maintain total control over the professional corporations and healthcare practices, their accounts receivable, and any revenues that might be generated therefrom.

194.    The Management Defendants' unlawful ownership and control of the Provider Defendants compromised patient care, because the provision of health services through the Provider Defendants was entirely subject to the pecuniary interests of its non-medical professional owners, not the independent medical judgment of a true medical professional-owner.

### C.    The Defendants' Fraudulent Treatment and Billing Protocol

195.    As part of the fraudulent scheme, the Provider Defendants obtained patients through a network of runners who were paid by the Management Defendants for each Insured they delivered to the Utica Avenue Clinic.

196.    Runners often approached Insureds at the scene of a car accident and directed or even transported them to the Utica Avenue Clinic for medically useless or illusory treatment.

197.    Virtually all of the Insureds who were delivered to the Utica Avenue Clinic by the runners were involved in relatively minor, "fender-bender" accidents, to the extent that they were involved in any actual accidents at all.

198.    Regardless of the nature of the accidents or the actual medical needs of the Insureds, the Defendants purported to subject virtually every Insured to a medically unnecessary course of "treatment" that was provided pursuant to a pre-determined, fraudulent protocol designed to maximize the billing that they could submit through the Provider Defendants to insurers, including GEICO, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to it.

199.    The Defendants provided their pre-determined fraudulent treatment protocol to Insureds without regard for the Insureds' individual symptoms or presentment.

200.    Each step in the fraudulent treatment protocol was designed to falsely reinforce the rationale for the previous step and provide a false justification for the subsequent step, and thereby permit the Defendants to generate and falsely justify the maximum amount of fraudulent no-fault billing for each Insured.

201.    Most patients treated at the Utica Avenue Clinic purportedly underwent an initial examination, which resulted with each patient being diagnosed with conditions that varied little and the examining provider consistently concluding that the same predetermined treatment was medically necessary for each patient.   The examinations invariably led to voluminous and excessive physical therapy, chiropractic, acupuncture, and diagnostic testing.

**1.      The Fraudulent Initial Examinations**

202.    After the runners delivered an Insured to the Utica Avenue Clinic, the Defendants purported to provide virtually every Insured with an initial examination.

203.    The initial examinations were performed – to the extent that they were performed at all – to provide Insureds with pre-determined diagnoses to allow the Defendants to then provide a host of medically unnecessary or illusory services.

204.    Typically, Utica Comprehensive, the Fraudulent Ajudua Practice, Fraudulent Kelly Practice, Effective Healthcare and BD Medical (the "Examination Defendants"), purported to provide the initial examinations. The Examination Defendants also submitted initial examination reports which were form documents with check boxes or circled fields, and few contained extensive comments or narration beyond the markings in boxes or circles.

205.    The Examination Defendants and the Management Defendants virtually always billed the initial examinations to GEICO under current procedural terminology ("CPT") code 99244, representing a 60-minute consultation, typically resulting in a charge of $236.94, or under code 99205, representing a 60-minute evaluation; typically resulting in a charge of $236.94.

206.    The charges for the initial examinations were fraudulent in that the examinations were medically unnecessary and were performed pursuant to the fraudulent treatment protocol established by the Management Defendants.

207.    Furthermore, the charges for the initial examinations were fraudulent in that they misrepresented the nature and extent of the initial examinations.

208.    Under the New York Workers' Compensation Medical Fee Schedule (the "Fee Schedule"), which is applicable to claims for No-Fault Benefits, the use of CPT code 99244 or 99205 typically requires that the Insured present with problems of moderate-to-high severity.

209.    Though the Defendants routinely billed for the initial examinations under CPT code 99244 and 99205, the Insureds almost never presented with problems of moderate-to-high severity.

210.    Furthermore, the use of CPT code 99244 and 99205 typically requires that the physician spend 60 minutes of face-to-face time with the Insured or the Insured's family.

211.    Neither Dr. Ajudua, Dr. Kelly, Dr. Dublin, nor any other licensed healthcare provider associated with Utica Comprehensive, the Fraudulent Ajudua Practice, Fraudulent Kelly Practice, Effective Healthcare, or BD Medical spent 60 minutes on an initial examination. Rather, in those cases where the initial examinations were actually conducted, they rarely lasted more than 15 to 30 minutes.

212.    In addition, according to the Fee Schedule, when the Defendants submitted charges for initial examinations under CPT code 99244 and 99205, they represented that: (i) they took a "comprehensive" patient history; (ii) they conducted a "comprehensive" physical examination; and (iii) they engaged in medical decision-making of "moderate complexity" or "high complexity."

213.    Pursuant to the Fee Schedule, a "comprehensive" patient history requires – among other things – that the healthcare provider take a history of virtually all body systems, not only the body systems that are related to the patient's present complaint. A "comprehensive" patient history also requires that the healthcare provider take a complete past, family, and social history from the patient.

214.    When the Defendants billed for the initial examinations under CPT code 99244 and 99205, they falsely represented that they took a "comprehensive" patient history from the Insureds they purported to treat during the initial examinations and consultations.

215.    Rather, after purporting to provide the initial examinations, the Defendants prepared reports designed solely to support the laundry-list of Fraudulent Services that the Defendants purported to provide and then billed to GEICO and other insurers.

216.    Pursuant to the Fee Schedule, the complexity of medical decision-making is measured by: (i) the number of diagnoses and/or the number of management options to be

considered; (ii) the amount and/or complexity of medical records, diagnostic tests, and other information that must be retrieved, reviewed, and analyzed; and (iii) the risk of significant complications, morbidity, mortality, as well as co-morbidities associated with the patient's presenting problems, the diagnostic procedures, and/or the possible management options.

217.    Though the Defendants routinely falsely represented that their initial examinations involved medical decision-making of "moderate complexity" or "high complexity" when billing under CPT code 99244 or 99205, in actuality the initial examinations did not involve any medical decision-making at all.

218.    First, the initial examinations did not involve the retrieval, review, and analysis of any medical records, diagnostic tests, or other information. When a runner delivered an Insured to the Utica Avenue Clinic for "treatment," the Insured generally did not arrive with any medical records. Furthermore, prior to the initial examinations, the Defendants did not request medical records from any other providers.

219.    Second, there was no risk of significant complications or morbidity – much less mortality – from the Insureds' relatively minor complaints.  Nor, by extension, was there any risk of significant complications, morbidity, or mortality from the diagnostic procedures or treatment options provided by the Defendants, to the extent that the Defendants provided any such diagnostic procedures or treatment options at all.  In almost every instance, any diagnostic procedures and "treatments" that the Defendants actually performed were limited to a series of medically unnecessary modalities, none of which were threatening to an Insured's health or life if properly administered.

220.    Third, the Defendants did not consider any significant number of diagnoses or treatment options for Insureds during the initial examinations.

221.   Rather, to the extent that the initial examinations were conducted in the first instance, physicians associated with the Examination Defendants made boilerplate, pre-determined "diagnosis" for Insureds, and prescribed a virtually identical course of extensive and unnecessary treatment for each Insured.

222.   Typically, the Examination Defendants directed Insureds to return to the Provider Defendants several times per week for medically unnecessary follow-up examinations, physical therapy, acupuncture, chiropractic services, myriad diagnostic testing and range of motion/manual muscle testing--all pursuant to the predetermined treatments protocols established and imposed by the Management Defendants.

**2.      The Fraudulent Follow-Up Examinations**

223.   In addition to the fraudulent initial examinations, the Defendants typically purported to subject Insureds to one or more fraudulent follow-up examinations during the course of their fraudulent treatment protocol.

224.   Typically, the Examination Defendants purported to provide the follow-up examinations.

225.   The Defendants almost always billed the follow-up examinations to GEICO under CPT code 99214, representing a 25-minute evaluation, typically resulting in a charge of $92.97.

226.   Like the Defendants' charges for the initial examinations, the charges for the follow-up examinations were fraudulent in that the follow-up examinations were medically unnecessary and were performed – to the extent they were performed at all – pursuant to the fraudulent treatment protocol established by the Management Defendants.

227.   The charges for the follow-up examinations also were fraudulent in that they misrepresented the nature and extent of the follow-up examinations.

228.     According to the Fee Schedule, the use of CPT code 99214 typically requires that the Insured present with problems of moderate-to-high severity.

229.     Though the Examination Defendants routinely billed for the follow-up examinations under CPT codes 99214, the Insureds did not present with problems of moderate-to-high severity. Rather, the Insureds often had no medical problems at all as the result of any automobile accident.

230.     Furthermore, the use of CPT code 99214 typically requires that the physician spend 25 minutes of face-to-face time with the Insured or the Insured's family.

231.     Though the Examination Defendants routinely billed for the follow-up examinations under CPT codes 99214, no physician associated with the Examination Defendants spent 25 minutes, of face-to-face time with the Insureds or their families during the follow-up examinations.

232.     In keeping with the fact that Provider Defendants were owned and controlled by the Management Defendants and that the follow-up examinations involved no actual medical decision-making, the Examination Defendants (i) used substantially similar template forms for their follow-up examination reports; and (ii) offered substantially similar boilerplate diagnoses.

**3.      The Fraudulent "Outcome Assessment Testing"**

233.     In addition to the other Fraudulent Services, the Defendants frequently subjected Insureds to one or more medically useless "outcome assessment test," generally on the same dates they purported to subject the Insureds to initial or follow-up examinations.

234.     The Defendants billed the "outcome assessment tests" to GEICO through Utica Comprehensive, the Fraudulent Ajudua Practice, Fraudulent Kelly Practice, Effective Healthcare

and BD Medical ("OAT Defendants") under CPT code 99358, generally resulting in a charge of $204.41 for each round of "testing."

235.    Like the Defendants' charges for the other Fraudulent Services, the charges for the "outcome assessment tests" were fraudulent in that the tests were medically unnecessary and, even when actually performed, were performed pursuant to the fraudulent treatment protocol established by the Management Defendants.

236.    The "outcome assessment tests" that the Defendants purported to provide Insureds were simply pre-printed, multiple-choice questionnaires on which the Insureds were invited to report the symptoms they purportedly were experiencing, and the impact of those symptoms on their lives.

237.    Since a patient history and physical examination must be conducted as an element of a soft-tissue trauma patient's initial and follow-up examinations, and since the "outcome assessment tests" that the OAT Defendants purported to provide were nothing more than a questionnaire regarding the Insureds' history and physical condition, the Fee Schedule provides that the "outcome assessment tests" should have been reimbursed as an element of the initial examinations and follow-up examinations. In other words, healthcare providers cannot conduct and bill for an initial examination or follow-up examination, then bill separately for contemporaneously-provided "outcome assessment tests."

238.    The information gained through the use of the "outcome assessment tests" that the OAT Defendants purported to provide was not significantly different from the information that the OAT Defendants purported to obtain during virtually every Insured's initial examination and follow-up examinations.

239.   Under the circumstances employed by the OAT Defendants, the "outcome assessment tests" represented purposeful and unnecessary duplication of the patient histories and examinations purportedly conducted during the Insured's initial examination and follow-up examinations. The "outcome assessment tests" were part and parcel of the Defendants' fraudulent scheme, inasmuch as the "service" was rendered pursuant to a pre-determined protocol that: (i) in no way aided in the assessment and treatment of the Insureds; and (ii) was designed solely to financially enrich the Defendants.

240.   The OAT Defendants' use of CPT code 99358 to bill for the "outcome assessment tests" also constituted a deliberate misrepresentation of the extent of the service that was provided. Pursuant to the Fee Schedule, the use of CPT code 99358 represents – among other things – that the physician actually spent at least one hour performing some prolonged service, such as review of extensive records and tests, or communication with the patient and his or her family.

241.   Though the OAT Defendants routinely submitted billing for the "outcome assessment tests" under CPT code 99358, no physician associated with the Utica Clinic spent an hour reviewing or administering the tests.

242.   Nevertheless, the Management Defendants and OAT Defendants submitted billing to GEICO for thousands of dollars in fraudulent billing under CPT code 99358.

243.   In keeping with the fact that the Management Defendants exercised complete ownership and control over the Provider Defendants, the narrative summaries that were submitted to GEICO through the OAT Defendants contained a verbatim description of the tests purportedly administered, a verbatim description of patient results, a verbatim description of treatment goals, and a verbatim statement of medical necessity.

4.      **The Fraudulent V-sNCTs**

244.    Defendants, using Granovsky and Global Health ("V-sNCT Defendants"), furthered their scheme by billing for Voltage-actuated Sensory Nerve Conduction Threshold Tests ("V-sNCT"), a medically unproven test, in cookie-cutter fashion, aimed solely at enriching Defendants.

245.    The methods currently employed to test sensory nerve function include NCVs and sensory nerve biopsy. Sensory nerves gather information on various types of sensation and conduct that information through electrical impulses to the spinal cord and the brain. In the brain this information is processed and interpreted. Fibers direct these sensory impulses from the periphery to the brain.

246.    The ability of V-sNCT testing to diagnose the existence, nature, severity or specific location of any abnormalities in the sensory nerves remains unproven. Even if V-sNCT testing could produce any valid diagnostic information regarding the sensory nerves: (a) there is no reliable evidence to prove that any such information would have any value beyond that which could be gleaned from a routine history and physical examination of the patient; (b) there is no reliable evidence to prove that any such information would indicate the nature or extent of any abnormality in the sensory nerves or sensory nerve roots; (c) there is no reliable evidence to prove that any such information would indicate the specific location of the abnormality along the sensory nerve pathways; (d) V-sNCT testing does not provide any information regarding the motor nerves or motor nerve roots which are as important as the sensory nerves or sensory nerve roots that may be injured in an auto accident, and (e) there would be no diagnostic advantage to using V-sNCT testing to obtain information regarding the sensory nerve fibers where, as here, patients were also subjected to nerve conduction velocity tests ("NCV"), electromyography test

54

("EMG") and MRIs – through non-defendant transient providers - which are well established in the medical, neurological and radiological communities for diagnosing the existence, nature, severity and specific location of any abnormalities in both the sensory and motor nerves as well as the nerve roots.

247.    Indeed, in May 2002, the Department of Health and Human Services and the Centers for Medicare and Medicaid Services issued a determination of Non-Coverage of Perception Sensory Threshold/Nerve Conduction Threshold Tests. The Non-Coverage Determination specifically stated that: "The Current Perception Threshold/Sensory Nerve Conduction Threshold test is a diagnostic test used to diagnose sensory neuropathies.  It is a noninvasive test that uses transcutaneous electrical stimulus to evoke a sensation.  There is insufficient scientific or clinical evidence to consider this device reasonable and necessary within the meaning of section 1862(a)(1)(A) of the Social Security Act.  Therefore effective for dates of service on or after October 1, 2002, this test will not be covered by Medicare . . . ."  In 2004, the Department of Health and Human Services and the Centers for Medicare and Medicaid Services reaffirmed its Non-Coverage of Sensory Nerve Conduction Threshold Tests.

248.    In order to circumvent the Fee Schedule, and conceal the lack of scientific or clinical evidence supporting the medical necessity of V-sNCTs, the V-sNCT Defendants knowingly and intentionally billed for these tests under CPT Code 95904 to misrepresent the services provided and to induce GEICO to pay for the charges.

249.    As per the Fee Schedule, code 95904 reflects the performance of an NCV.  NCVs are non-invasive tests wherein peripheral nerves in the arms and legs are stimulated with an electrical impulse that causes the nerve to depolarize and transmit.  The depolarization, transmission, or "firing," of the nerve is measured and recorded with electrodes attached to the

surface of the skin. An EMG/NCV machine then documents the timing of the nerve response (the "latency"), the magnitude of the response (the "amplitude"), and the speed at which the nerve conducts the impulse over a measured distance (the "conduction velocity"). In addition, the EMG/NCV machine displays the changes in amplitude over time as a "waveform." The amplitude, latency, and shape of the response then should be compared with well-defined normal values to identify the existence, nature, extent, and specific location of any abnormalities in the sensory and motor nerve fibers.

250.    The V-sNCT Defendants, however, never conducted NCV tests on Insureds. There were no measurements of latency, amplitude or velocity. Rather, Defendants performed V-sNCTs. The 95904 code represents the performance of sensory nerve conduction studies which is scientifically based measurements of the velocity of transmission of nerve impulses and despite the use of the word sensory there is absolutely no resemblance to V-sNCT, which does not test nerve conduction velocity. As such, the use of code 95904 is not permissible for V-sNCTs.

251.    Furthermore, V-sNCT "guidelines" state that radiating symptoms following trauma and symptoms resistant to conservative care and axial symptoms for more than eight weeks may support the use of V-sNCT testing. The V-sNCT Defendants pre-determined fraudulent protocol ignored this guideline and used V-sNCT testing on Insureds well within eight weeks of the date of accident, foregoing any type of conservative treatment to succeed, no doubt to collect on the fraudulently submitted bills.

252.    In sum, the ordering and performing by the V-sNCT Defendants was done pursuant to a bogus, pre-determined protocol which was designed by the Defendants solely to maximize the potential charges that they could submit, and cause to be submitted, to GEICO, and

was billed in such a way to mislead GEICO into reimbursement for medically unnecessary testing.

### 5.     The Fraudulent Acupuncture Treatment

253.    In addition to the other Fraudulent Services that the Defendants purported to provide, Super AM, Bigley, Qiu, East Pearl, Gao, and Xu Gao Acu (the "Acupuncture Defendants") purported to subject many Insureds to a series of medically unnecessary acupuncture treatments.

254.    Like the Defendants' charges for the other Fraudulent Services, the charges for acupuncture were fraudulent in that the acupuncture was medically unnecessary and was performed – to the extent it was performed at all – pursuant to the fraudulent treatment protocol established by the Management Defendants.

### a.  Legitimate Acupuncture Practices

255.    Acupuncture is predicated upon the theory that there are twelve main meridians ("the Meridians") in the human body through which energy flows.  Every individual has a unique energy flow ("Chi") or, more particularly, unique patterns of underlying strengths and weaknesses in the flow of Chi that are impacted differently from trauma.  When an individual's unique Chi becomes disrupted or imbalanced for any reason (such as trauma), needles can be inserted or pressure can be applied to very specific points ("Acupuncture Points") along the Meridians to remove the disruption or imbalance and restore the patient's unique Chi.

256.    The goal of any legitimate acupuncture treatment is to effectively treat and benefit the patient by restoring his or her unique Chi, relieving his or her symptoms, and returning him or her to normal activity.  Since every individual has a unique Chi, acupuncture treatment should

57

be individualized. In fact, the differences in each individual's unique patterns of underlying strengths and weaknesses in the flow of Chi should be reflected in different treatment strategies.

257. Moreover, any legitimate acupuncture treatment requires a continuous assessment of the patient's condition and energy flow, as well as the therapeutic effect of previous treatments. Therefore, adjustments in treatment should be made as treatment progresses over time in order to improve the therapeutic effectiveness of each treatment, and eventually to return the patient to maximum health.

258. Any legitimate acupuncture treatment also requires meaningful, genuine, and individualized documentation of the: (i) physical examination; (ii) diagnosis; (iii) treatment plan; (iv) results of each session; and (v) the patient's progress throughout the course of treatment.

259. The Acupuncture Defendants treated each patient without regard to any necessary individual treatment strategies, without regard to any necessary adjustments in treatment as treatment progresses over time, and without meaningful, genuine, and individualized documentation.

260. At best, the purported "acupuncture" services provided by the Acupuncture Defendants consisted of inserting needles into Insureds in an assembly-line fashion that bore little, if any, relation to the Insured's condition and instead reflect a predetermined protocol designed to enrich the Defendants through the submission of fraudulent charges to GEICO and other insurers.

### b. The Acupuncture Defendants' Fraudulent Initial Examinations

261. The Acupuncture Defendants purported to begin treatment of nearly every Insured with an initial examination which was billed under CPT code 99202 or 99203, typically resulting in charges between $61.43 and $100.00.

262.     The charges for the initial examinations were fraudulent in that the examinations were medically unnecessary and were performed – to the extent they were performed at all – pursuant to the fraudulent treatment protocol established by the Management Defendants.

263.     Furthermore, the Defendants' charges for the initial examinations were fraudulent in that they misrepresented the extent of the initial examinations.

264.     Specifically, the use of CPT code 99203 typically requires that the physician spend 30 minutes of face-to-face time with the Insured or the Insured's family. The use of CPT code 99202 typically requires that the physician spend 20 minutes of face-to-face time with the Insured or the Insured's family.

265.     Though the Acupuncture Defendants routinely billed for the initial examinations under CPT code 99202 and 99203, no acupuncturist associated with the Acupuncture Defendants spent 20-30 minutes of face-to-face time with the Insureds or their families during the initial examinations. Rather, the initial examinations rarely lasted more than 10 minutes, to the extent they were conducted at all.

266.     In keeping with the fact that the initial examinations rarely lasted more than 10 minutes – to the extent they were conducted at all – the Acupuncture Defendants used pre-printed checklist or template forms in conducting the examinations.

267.     The pre-printed checklist and template forms that the Acupuncture Defendants used in conducting the initial examinations set forth a very limited range of potential patient complaints, pain level, and treatment recommendations, and were severely deficient in terms of an intake examination.

268.     The documentation of the examinations also demonstrates that there are serious questions regarding not only the quality, but the veracity of the exams.  For example, in many instances, plain indications are always reported as high, yet the reported injuries appear minor.

269.     Further, as to at least one of the Acupuncture Providers, the examination reports were plainly fabricated, since virtually every patient purportedly examined by Super AM had every range of motion measurement reported as 10 degrees less than normal. This is incredible, and indicates that the measurements were fabricated rather than measured.

### c.   The Acupuncture Defendants' Fraudulent Acupuncture Treatments and Billing

270.     Furthermore, the documentation of the purported acupuncture treatments rendered under the names of the Acupuncture Defendants demonstrates that no genuine effort was made to treat the patients' actual injuries, to properly assess their condition, to track their improvement or lack of improvement, or to adjust the treatment to reflect the patients' improvement or lack of improvement.

271.     Following the fraudulent initial examinations, the Acupuncture Defendants purported to provide acupuncture treatments that were billed to GEICO under CPT codes 97810, 97811, 97813, and 97814, among others.

272.     The purported "acupuncture" services provided by the Acupuncture Defendants did not remotely comport with any of the aforesaid basic, legitimate acupuncture requirements. All patients were treated with repetitive and virtually identical point prescriptions, without regard to any necessary individual treatment strategies, without regard to any necessary adjustments in treatment as treatment progresses over time, and without meaningful, genuine, and individualized documentation.

273.   At best, the purported "acupuncture" services provided by the Acupuncture Defendants consisted of inserting needles into Insureds in an assembly-line fashion that bore little, if any, relation to the Insured's condition and were not designed to effectively treat or otherwise benefit the Insureds.

274.   The services billed for by the Acupuncture Defendants also reflect a lack of independent professional acupuncture judgment and instead reflect a predetermined protocol designed to enrich the Defendants through the submission of fraudulent charges to GEICO and other insurers.

275.   For instance, the number of needles used were often insufficient; the number and location of acupuncture points used were insufficient to justify the number of units billed; patients were universally getting a very high frequency of treatment that was not supported by the alleged injuries and not adjusted to reflect the Insureds' improvement or lack thereof.  All of this demonstrates that the Acupuncture Defendants were engaged in a systematized treatment and billing scheme designed to create inflated billings and render medically unnecessary care.

276.   The Acupuncture Defendants' cookie-cutter treatment protocol is further established by the Acupuncture Defendants routinely billing three units of acupuncture per treatment date per patient, purportedly consisting of up to 45 minutes of personal, one-on-one contact, per Insured, per day.

277.   The New York Workers' Compensation Fee Schedule used for No-Fault billing (the "Fee Schedule") sets forth the billing codes and requirements for billing acupuncture services to insurers, as follows:

| 97810 | Acupuncture, one or more needles, without electrical stimulation; initial 15 minutes of personal one-on-one contact with the patient |
|---|---|
| 97811 | without electrical stimulation, each additional 15 minutes of personal one-on-one contact with the patient, with re-insertion of needle(s) (List separately in addition to code for primary procedure) |
| 97813 | with electrical stimulation, initial 15 minutes of personal one-on-one contact with the patient |
| 97814 | with electrical stimulation, each additional 15 minutes of personal one-on-one contact with the patient, with re-insertion of needle(s) (List separately in addition to code for primary procedure) |

278.     The purported acupuncture treatment described in the Acupuncture Defendants'
treatment notes in almost all cases fails to justify the billing submitted for multiple units of
personal, one-on-one contact, along with re-insertion, for 3 units of treatment.

279.     Defendants' fraudulent billing scheme misrepresented and exaggerated the level
of services provided in order to inflate the charges submitted to GEICO.   Specifically, the
Acupuncture Defendants uniformly submitted billing to GEICO for multiple segments of
purported one-on-one contact rendered on the same day for each Insured, notwithstanding the
fact that the "treatments" allegedly rendered by the Acupuncture Defendants were (or could have
been) rendered in one treatment segment.

280.     The Defendants' cookie-cutter approach to the acupuncture treatments that they
performed, or cause to be performed, on Insureds was designed solely to maximize the charges
that they could submit through the Provider Defendants to GEICO and other insurers, and to
maximize their ill-gotten profits.

### 6.     The Fraudulent Chiropractic Treatment

281.    As part of the fraudulent treatment protocol instituted by the Management Defendants, the Fraudulent Granovsky Practice purported to subject many Insureds to a series of chiropractic treatments.

282.    Like the Defendants' charges for the other Fraudulent Services, the charges for chiropractic treatment were fraudulent in that the chiropractic treatment was performed – to the extent that it was performed at all – pursuant to the fraudulent treatment protocol established by the Management Defendants.

### 7.     The Fraudulent Physical Therapy Treatment

283.    As part of the fraudulent treatment protocol instituted by the Management Defendants, GS PT, Bishay, Habiba Care, Ahmed, Vision Rehab, Mahmoud (the "PT Defendants") purported to subject many Insureds to a series of physical therapy treatments.

284.    Like the Defendants' charges for the other Fraudulent Services, the charges for physical therapy treatment were fraudulent in that the physical therapy treatment was performed – to the extent that it was performed at all – pursuant to the fraudulent treatment protocol established by the Management Defendants.

## IV.    The Fraudulent Billing the Defendants Submitted or Caused to be Submitted to GEICO

285.    To support their fraudulent charges, the Defendants systematically submitted or caused to be submitted thousands of NF-3 forms and treatment reports through the Provider Defendants to GEICO seeking payment for the Fraudulent Services for which the Defendants were not entitled to receive payment.

286.   The NF-3 forms submitted to GEICO by and on behalf of the Defendants were false and misleading in the following material respects:

(i)   The NF-3 forms uniformly misrepresent to GEICO that the Provider Defendants are lawfully licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12).   In fact, the Provider Defendants are not properly licensed in that they are fraudulently incorporated, and/or have been owned and controlled by the Management Defendants, who are not physicians, and have been illegally operating.

(ii)   The NF-3 forms uniformly misrepresent to GEICO that the Provider Defendants are lawfully licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12).   In fact, the Provider Defendants are not properly licensed in that they engaged in unlawful fee splitting arrangements with unlicensed, non-professionals.

(iii)   The NF-3 forms submitted by and on behalf of the Defendants uniformly misrepresent to GEICO that the Fraudulent Services actually were performed, and that the Fraudulent Services were medically necessary. In fact, the Fraudulent Services were not medically necessary and were performed as part of a pre-determined fraudulent treatment and billing protocol designed solely to financially enrich the Defendants.

(iv)   The NF-3 forms submitted by and on behalf of the Defendants uniformly misrepresent and exaggerate the level of service and the nature of the services that purportedly were provided.

## V.   The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance

287.   The Defendants legally and ethically were obligated to act honestly and with integrity in connection with the billing that they submitted, or caused to be submitted, to GEICO.

288.   To induce GEICO to promptly pay the fraudulent charges for the Fraudulent Services, the Defendants systemically concealed their fraud and went to great lengths to accomplish this concealment.

289.   Specifically, the Defendants knowingly misrepresented and concealed facts related to the Provider Defendants in an effort to prevent discovery that the Provider Defendants were

fraudulently owned and controlled and unlawfully split fees with unlicensed persons, and therefore are ineligible to bill for or collect No-Fault Benefits.

290.    For example, the Defendants misrepresented ownership of and control over the Provider Defendants in filings with the New York State Department of Education, so as to (i) induce the New York State Department of Education ("DOE") to issue the licenses required to permit the Provider Defendants to engage in the practice of a licensed profession; (ii) induce the DOE to continue to recognize the Provider Defendants as being legally organized and authorized to practice their respective professions; and/or (iii) induce the DOE to allow the licensed professionals to continue to lawfully practice their profession, despite the control of their licenses by unlicensed laypersons.

291.    The Management Defendants also entered into various financial arrangements with the Provider Defendants that were designed to, and did, conceal their true ownership of and control over the Provider Defendants, as well as the illegal fee splitting.

292.    Furthermore, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services were medically unnecessary and performed pursuant to fraudulent pre-determined protocols designed to maximize the charges that could be submitted rather than to benefit the Insureds who supposedly were subjected to them.

293.    In addition, in every bill that the Defendants submitted or caused to be submitted, the Defendants uniformly concealed the fact that the Defendants misrepresented and exaggerated the level and nature of the services purportedly provided, and inflated the billing to insurers.

294.    What is more, the Defendants billed for the Fraudulent Services through multiple individuals and entities using multiple tax identification numbers in order to reduce the amount of

billing submitted through any single individual or entity or under any single tax identification number, thereby preventing GEICO from identifying the pattern of fraudulent charges submitted through any one entity.

295. Once GEICO began to suspect that the Defendants were engaged in fraudulent billing and treatment activities, GEICO requested that certain of the Provider Defendants, including Utica Comprehensive, Global Health, East Pearl, and Super AM, provide additional verification, including but not limited to, examinations under oath to determine whether the charges submitted through these professional corporations were legitimate. Nevertheless, in an attempt to conceal their fraud, these professional corporations systematically failed and/or refused to respond to repeated requests for verification of the charges submitted.

296. GEICO maintains standard office practices and procedures that are designed to and do ensure that no-fault claim denial forms or requests for additional verification of no-fault claims are properly addressed and mailed in a timely manner in accordance with the No-Fault Laws.

297. In accordance with the No-Fault Laws, and GEICO's standard office practices and procedures, GEICO either: (i) timely and appropriately denied the pending claims for No-Fault Benefits submitted through the Defendants; or (ii) timely issued requests for additional verification with respect to all of the pending claims for No-Fault Benefits submitted through the defendants (yet GEICO failed to obtain compliance with the requests for additional verification), and, therefore, GEICO's time to pay or deny the claims has not yet expired.

298. The Defendants hired law firms to pursue collection of the fraudulent charges from GEICO and other insurers. These law firms routinely filed expensive and time-consuming litigation against GEICO and other insurers if the charges were not promptly paid in full.

66

299.     GEICO is under statutory and contractual obligations to promptly and fairly process claims within 30 days. The facially-valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and fraudulent litigation activity described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO incurred damages of more than $2,610,000.00 based upon the fraudulent charges.

300.     Based upon the Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

## FIRST CAUSE OF ACTION
### Against All Defendants
### (Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)

301.     GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

302.     There is an actual case in controversy between GEICO and the Defendants regarding more than $2,575,000.00 in fraudulent billing for the Fraudulent Services that has been submitted to GEICO under the names of the Provider Defendants.

303.     The Defendants have no right to receive payment for any pending bills submitted to GEICO under the names of the Provider Defendants because the Provider Defendants were fraudulently incorporated, and/or secretly and unlawfully owned and controlled by unlicensed individuals and entities.

304.     The Defendants have no right to receive payment for any pending bills submitted to GEICO under the names of the Provider Defendants because the Provider Defendants engaged in illegal fee-splitting with unlicensed individuals and entities and, therefore, were ineligible to bill for or to collect No-Fault Benefits.

305.    The Defendants have no right to receive payment for any pending bills submitted to GEICO under the names of the Provider Defendants because the Fraudulent Services were not medically necessary and were provided – to the extent they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them.

306.    The Defendants have no right to receive payment for any pending bills submitted to GEICO under the names of the Provider Defendants because the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

307.    Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that:

(i)    the Provider Defendants have no right to receive payment for any pending bills submitted to GEICO because they were fraudulently incorporated, and/or illegally owned and/or controlled by non-physicians and, therefore, are ineligible to seek or recover no-fault benefits;

(ii)    the Provider Defendants have no right to receive payment for any pending bills submitted to GEICO because they engaged in unlawful fee-splitting;

(iii)    the Provider Defendants have no right to receive payment for any pending bills submitted to GEICO because the Fraudulent Services were medically unnecessary and were ordered and performed – to the extent that they were performed at all – pursuant to fraudulent, pre-determined protocols designed solely to maximize charges to GEICO, not because they were medically necessary or designed to facilitate the treatment of or otherwise benefit the Insureds who purportedly have been subjected to them; and

(iv)    the Provider Defendants have no right to receive payment for any pending bills submitted to GEICO because the CPT codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

## SECOND CAUSE OF ACTION
### Against Dr. Ajudua and the Management Defendants
### (Violation of RICO, 18 U.S.C. § 1962(c))

308.   GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

309.   Utica Comprehensive Medical, PC is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

310.   Dr. Ajudua and the Management Defendants knowingly have conducted and/or participated, directly or indirectly, in the conduct of Utica Comprehensive's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over twenty-two months seeking payments that Utica Comprehensive was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully owned and controlled by unlicensed laypersons; (ii) it engaged in fee-splitting with unlicensed laypersons; (iii) the billed-for-services were not medically necessary; (iv) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; and (v) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1."

311.   Utica Comprehensive's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud

69

are the regular way in which Dr. Ajudua and the Management Defendants operated Utica Comprehensive, inasmuch as Utica Comprehensive never was eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore were essential in order for Utica Comprehensive to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through Utica Comprehensive to the present day.

312.  Utica Comprehensive is engaged in inherently unlawful acts, inasmuch as it's very corporate existence is an unlawful act, considering that it is fraudulently incorporated, owned and controlled by non-physicians, and its existence therefore depends on continuing misrepresentations made to the New York State Department of Education and the New York State Department of State.  Utica Comprehensive likewise is engaged in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Utica Comprehensive in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

313.  GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $162,000.00 pursuant to the fraudulent bills submitted by the Defendants through Utica Comprehensive.

314.  By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### THIRD CAUSE OF ACTION
#### Against Dr. Ajudua and the Management Defendants
#### (Violation of RICO, 18 U.S.C. § 1962(d))

315.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

316.    Utica Comprehensive is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

317.    Dr. Ajudua and the Management Defendants are employed by and/or associated with the Utica Comprehensive enterprise.

318.    Dr. Ajudua and the Management Defendants knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of Utica Comprehensive enterprise's affairs, through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges seeking payments that Utica Comprehensive was not eligible to receive under the No-Fault Laws because: (i) it was owned and controlled by unlicensed laypersons; (ii) it engaged in fee-splitting with unlicensed laypersons; (iii) the billed-for-services were not medically necessary; (iv) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; and (v) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1."

319. Dr. Ajudua and the Management Defendants knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

320. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $162,000.00 pursuant to the fraudulent bills submitted by the Defendants through Utica Comprehensive.

321. By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

**FOURTH CAUSE OF ACTION**
**Against Utica Comprehensive, Dr. Ajudua, and the Management Defendants**
**(Common Law Fraud)**

322. GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

323. Utica Comprehensive, Dr. Ajudua, and the Management Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services.

324. The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Utica Comprehensive was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact it was fraudulently incorporated and actually owned and controlled by unlicensed laypersons; (ii) in every claim, the representation that Utica Comprehensive was properly licensed, and therefore, eligible to receive No-Fault Benefits

72

pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact the professional corporation engaged in illegal fee-splitting with unlicensed laypersons; (iii) in every claim, the representation that the billed-for services were medically necessary and properly billed in accordance with the Fee Schedule, when in fact the billed-for services were not medically necessary and were performed and billed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants; and (iv) in every claim, the representation that the charges were appropriate and consistent with the service provided, when in fact the charges exaggerated the level of service and the nature of the service that purportedly was provided.

325.    Utica Comprehensive, Dr. Ajudua, and the Management Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Utica Comprehensive that were not compensable under the No-Fault Laws.

326.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $162,000.00 pursuant to the fraudulent bills submitted by the Defendants through Utica Comprehensive.

327.    The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

328.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## FIFTH CAUSE OF ACTION
### Against Utica Comprehensive, Dr. Ajudua, and the Management Defendants
### (Unjust Enrichment)

329.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

330.    As set forth above, Utica Comprehensive, Dr. Ajudua, and the Management Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

331.    When GEICO paid the bills and charges submitted by or on behalf of Utica Comprehensive for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

332.    Utica Comprehensive, Dr. Ajudua, and the Management Defendants have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

333.    Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

334.    By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $162,000.00.

## SIXTH CAUSE OF ACTION
### Against Dr. Ajudua and the Management Defendants
### (Common Law Fraud)

335.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

336.    Dr. Ajudua and the Management Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from

GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services in connection with the Fraudulent Ajudua Practice.

337. The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that the Fraudulent Ajudua Practice was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact it was actually controlled by unlicensed laypersons; (ii) in every claim, the representation that the Fraudulent Ajudua Practice was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact it engaged in illegal fee-splitting with unlicensed laypersons; (iii) in every claim, the representation that the billed-for services were medically necessary and properly billed in accordance with the Fee Schedule, when in fact the billed-for services were performed and billed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants; and (iv) in every claim, the representation that the charges were appropriate and consistent with the service provided, when in fact the charges exaggerated the level of service and the nature of the service that purportedly was provided. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO are described in the chart annexed hereto as Exhibit "2."

338. Dr. Ajudua and the Management Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through the Fraudulent Ajudua Practice that were not compensable under the No-Fault Laws.

339.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $94,000.00 pursuant to the fraudulent bills submitted by the Defendants through the Fraudulent Ajudua Practice.

340.   The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

341.   Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## SEVENTH CAUSE OF ACTION
### Against Dr. Ajudua and the Management Defendants
### (Unjust Enrichment)

342.   GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

343.   As set forth above, Dr. Ajudua and the Management Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO in connection with the Fraudulent Ajudua Practice.

344.   When GEICO paid the bills and charges submitted by or on behalf of the Fraudulent Ajudua Practice for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

345.   Dr. Ajudua and the Management Defendants have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

346.   Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

347.    By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $94,000.00.

### EIGHTH CAUSE OF ACTION
**Against Dr. Kelly and the Management Defendants**
**(Common Law Fraud)**

348.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

349.    Dr. Kelly and the Management Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services in connection with the Fraudulent Kelly Practice.

350.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that the Fraudulent Kelly Practice was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact it was actually controlled by unlicensed laypersons; (ii) in every claim, the representation that the Fraudulent Kelly Practice was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact it engaged in illegal fee-splitting with unlicensed laypersons; (iii) in every claim, the representation that the billed-for services were medically necessary and properly billed in accordance with the Fee Schedule, when in fact the billed-for services were performed and billed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants; and (iv) in every claim, the representation that the charges were appropriate and consistent with the service provided, when in fact the charges exaggerated the level of service and the nature of the service that purportedly was provided. A

representative sample of the fraudulent bills and corresponding mailings submitted to GEICO are described in the chart annexed hereto as Exhibit "3."

351.    Dr. Kelly and the Management Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through the Fraudulent Kelly Practice that were not compensable under the No-Fault Laws.

352.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $117,000.00 pursuant to the fraudulent bills submitted by the Defendants through the Fraudulent Kelly Practice.

353.    The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

354.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### NINTH CAUSE OF ACTION
**Against Dr. Kelly and the Management Defendants**
**(Unjust Enrichment)**

355.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

356.    As set forth above, Dr. Kelly and the Management Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO in connection with the Fraudulent Kelly Practice.

357. When GEICO paid the bills and charges submitted by or on behalf of the Fraudulent Kelly Practice for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

358. Dr. Kelly and the Management Defendants have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

359. Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

360. By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $117,000.00.

## TENTH CAUSE OF ACTION
### Against Effective Healthcare, Dr. Kelly and the Management Defendants
### (Common Law Fraud)

361. GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

362. Effective Healthcare, Dr. Kelly and the Management Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services.

363. The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Effective Healthcare was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact it was fraudulently incorporated and actually owned and controlled by unlicensed laypersons; (ii) in every claim, the representation that

Effective Healthcare was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact the professional corporation engaged in illegal fee-splitting with unlicensed laypersons; (iii) in every claim, the representation that the billed-for services were medically necessary and properly billed in accordance with the Fee Schedule, when in fact the billed-for services were not medically necessary and were performed and billed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants; and (iv) in every claim, the representation that the charges were appropriate and consistent with the service provided, when in fact the charges exaggerated the level of service and the nature of the service that purportedly was provided.  A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO are described in the chart annexed hereto as Exhibit "4."

364.    Effective Healthcare, Dr. Kelly and the Management Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Effective Healthcare that were not compensable under the No-Fault Laws.

365.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $114,000.00 pursuant to the fraudulent bills submitted by the Defendants through Effective Healthcare.

366.    The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

367.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## ELEVENTH CAUSE OF ACTION
### Against Effective Healthcare, Dr. Kelly and the Management Defendants
### (Unjust Enrichment)

368.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

369.    As set forth above, Effective Healthcare, Dr. Kelly and the Management Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

370.    When GEICO paid the bills and charges submitted by or on behalf of Effective Healthcare for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

371.    Effective Healthcare, Dr. Kelly and the Management Defendants have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

372.    Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

373.    By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $114,000.00.

## TWELFTH CAUSE OF ACTION
### Against BD Medical, Dr. Dublin and the Management Defendants
### (Common Law Fraud)

374.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

375.    BD Medical, Dr. Dublin, and the Management Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material

facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services.

376.   The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that BD Medical was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact it was actually owned and controlled by unlicensed laypersons; (ii) in every claim, the representation that BD Medical was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact the professional corporation engaged in illegal fee-splitting with unlicensed laypersons; (iii) in every claim, the representation that the billed-for services were medically necessary and properly billed in accordance with the Fee Schedule, when in fact the billed-for services were not medically necessary and were performed and billed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants; and (iv) in every claim, the representation that the charges were appropriate and consistent with the service provided, when in fact the charges exaggerated the level of service and the nature of the service that purportedly was provided.  A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO are described in the chart annexed hereto as Exhibit "5."

377.   BD Medical, Dr. Dublin, and the Management Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through BD Medical that were not compensable under the No-Fault Laws.

378.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $68,000.00 pursuant to the fraudulent bills submitted by the Defendants through BD Medical.

379.    The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

380.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**THIRTEENTH CAUSE OF ACTION**
**Against BD Medical, Dr. Dublin and the Management Defendants**
**(Unjust Enrichment)**

381.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

382.    As set forth above, BD Medical, Dr. Dublin and the Management Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

383.    When GEICO paid the bills and charges submitted by or on behalf of BD Medical for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

384.    BD Medical, Dr. Dublin and the Management Defendants have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

385.    Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

386.     By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $68,000.00.

## FOURTEENTH CAUSE OF ACTION
### Against GS PT, Bishay, and the Management Defendants
### (Common Law Fraud)

387.     GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

388.     GS PT, Bishay, and the Management Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services.

389.     The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that GS PT was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact it was actually owned and controlled by unlicensed laypersons; (ii) in every claim, the representation that GS PT was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact the professional corporation engaged in illegal fee-splitting with unlicensed laypersons; and (iii) in every claim, the representation that the billed-for services were medically necessary and properly billed in accordance with the Fee Schedule, when in fact the billed-for services were performed and billed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO are described in the chart annexed hereto as Exhibit "6."

84

390.    GS PT, Bishay, and the Management Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through GS PT that were not compensable under the No-Fault Laws.

391.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $169,000.00 pursuant to the fraudulent bills submitted by the Defendants through GS PT.

392.    The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

393.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**FIFTEENTH CAUSE OF ACTION**
**Against GS PT, Bishay, and the Management Defendants**
**(Unjust Enrichment)**

394.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

395.    As set forth above, GS PT, Bishay, and the Management Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

396.    When GEICO paid the bills and charges submitted by or on behalf of GS PT for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

397.     GS PT, Bishay, and the Management Defendants have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

398.     Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

399.     By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $169,000.00.

**SIXTEENTH CAUSE OF ACTION**
**Against Habiba Care, Ahmed, and the Management Defendants**
**(Common Law Fraud)**

400.     GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

401.     Habiba Care, Ahmed, and the Management Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services.

402.     The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Habiba Care was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact it was actually owned and controlled by unlicensed laypersons; (ii) in every claim, the representation that Habiba Care was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact the professional corporation engaged in illegal fee-splitting with unlicensed laypersons; and (iii) in every claim, the representation that the billed-for services

86

were medically necessary and properly billed in accordance with the Fee Schedule, when in fact the billed-for services were performed and billed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO are described in the chart annexed hereto as Exhibit "7."

403.     Habiba Care, Ahmed, and the Management Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Habiba Care that were not compensable under the No-Fault Laws.

404.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $152,000.00 pursuant to the fraudulent bills submitted by the Defendants through Habiba Care.

405.     The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

406.     Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**SEVENTEENTH CAUSE OF ACTION**
**Against Habiba Care, Ahmed, and the Management Defendants**
**(Unjust Enrichment)**

407.     GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

408.     As set forth above, Habiba Care, Ahmed, and the Management Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

87

409. When GEICO paid the bills and charges submitted by or on behalf of Habiba Care for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

410. Habiba Care, Ahmed, and the Management Defendants have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

411. Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

412. By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $152,000.00.

## EIGHTEENTH CAUSE OF ACTION
### Against Mahmoud and the Management Defendants
### (Violation of RICO, 18 U.S.C. § 1962(c))

413. GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

414. Vision Rehab PT, PC is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

415. Mahmoud and the Management Defendants knowingly have conducted and/or participated, directly or indirectly, in the conduct of Vision Rehab's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over twenty one months seeking payments that Vision Rehab was not eligible to receive under the No-Fault Laws because: (i) it was owned and controlled by unlicensed laypersons; (ii) it engaged in fee-splitting with unlicensed laypersons; and

88

(iii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "8."

416.    Vision Rehab's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Mahmoud and the Management Defendants operated Vision Rehab, inasmuch as Vision Rehab never was eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore were essential in order for Vision Rehab to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through Vision Rehab to the present day.

417.    Vision Rehab is engaged in inherently unlawful acts, inasmuch as it's very corporate existence is an unlawful act, considering that it is owned and controlled by non-physicians, and its existence therefore depends on continuing misrepresentations made to the New York State Department of Education and the New York State Department of State.  Vision Rehab likewise is engaged in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Vision Rehab in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

418.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $534,000.00 pursuant to the fraudulent bills submitted by the Defendants through Vision Rehab.

419.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

**NINETEENTH CAUSE OF ACTION**
**Against Mahmoud and the Management Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

420.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

421.    Vision Rehab PT, PC is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

422.    Mahmoud and the Management Defendants are employed by and/or associated with the Vision Rehab enterprise.

423.    Mahmoud and the Management Defendants knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of Vision Rehab enterprise's affairs, through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges seeking payments that Vision Rehab was not eligible to receive under the No-Fault Laws because: (i) it was owned and controlled by unlicensed laypersons; (ii) it engaged in fee-splitting with unlicensed laypersons; and (iii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants. A representative sample

of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "8."

424.     Mahmoud and the Management Defendants knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

425.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $534,000.00 pursuant to the fraudulent bills submitted by the Defendants through Vision Rehab.

426.     By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## TWENTIETH CAUSE OF ACTION
### Against Vision Rehab, Mahmoud, and the Management Defendants
### (Common Law Fraud)

427.     GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

428.     Vision Rehab, Mahmoud, and the Management Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services.

429.     The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Vision Rehab was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law §

5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact it was actually owned and controlled by unlicensed laypersons; (ii) in every claim, the representation that Vision Rehab was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact the professional corporation engaged in illegal fee-splitting with unlicensed laypersons; and (iii) in every claim, the representation that the billed-for services were medically necessary and properly billed in accordance with the Fee Schedule, when in fact the billed-for services were performed and billed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants.

430.    Vision Rehab, Mahmoud, and the Management Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Vision Rehab that were not compensable under the No-Fault Laws.

431.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $534,000.00 pursuant to the fraudulent bills submitted by the Defendants through Vision Rehab.

432.    The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

433.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### TWENTY-FIRST CAUSE OF ACTION
### Against Vision Rehab, Mahmoud, and the Management Defendants
### (Unjust Enrichment)

434.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

435.    As set forth above, Vision Rehab, Mahmoud, and the Management Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

436.    When GEICO paid the bills and charges submitted by or on behalf of Vision Rehab for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

437.    Vision Rehab, Mahmoud, and the Management Defendants have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

438.    Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

439.    By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $534,000.00.

### TWENTY-SECOND CAUSE OF ACTION
### Against Super AM, Bigley, and the Management Defendants
### (Common Law Fraud)

440.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

441.    Super AM, Bigley, and the Management Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from

GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services.

442.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Super AM was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact it was actually owned and controlled by unlicensed laypersons; (ii) in every claim, the representation that Super AM was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact the professional corporation engaged in illegal fee-splitting with unlicensed laypersons; (iii) in every claim, the representation that the billed-for services were medically necessary and properly billed in accordance with the Fee Schedule, when in fact the billed-for services were not medically necessary, were performed and billed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants; and (iv) in every claim, the representation that the charges were appropriate and consistent with the service provided, when in fact the charges exaggerated the level of service and the nature of the service that purportedly was provided. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO are described in the chart annexed hereto as Exhibit "9."

443.    Super AM, Bigley, and the Management Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Super AM that were not compensable under the No-Fault Laws.

444.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $162,000.00 pursuant to the fraudulent bills submitted by the Defendants through Super AM.

445.    The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

446.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### TWENTY-THIRD CAUSE OF ACTION
**Against Super AM, Bigley, and the Management Defendants**
**(Unjust Enrichment)**

447.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

448.    As set forth above, Super AM, Bigley, and the Management Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

449.    When GEICO paid the bills and charges submitted by or on behalf of Super AM for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

450.    Super AM, Bigley and the Management Defendants have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

451.    Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

452.    By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $162,000.00.

**TWENTY-FOURTH CAUSE OF ACTION**
**Against East Pearl, Qiu, and the Management Defendants**
**(Common Law Fraud)**

453.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

454.    East Pearl, Qiu, and the Management Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services.

455.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that East Pearl was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact it was actually owned and controlled by unlicensed laypersons; (ii) in every claim, the representation that East Pearl was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact the professional corporation engaged in illegal fee-splitting with unlicensed laypersons; (iii) in every claim, the representation that the billed-for services were medically necessary and properly billed in accordance with the Fee Schedule, when in fact the billed-for services were not medically necessary and were performed and billed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants; and (iv) in every claim, the representation that the charges were appropriate and consistent with the service provided, when in fact the charges exaggerated the level of service and the nature of the service

that purportedly was provided. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO are described in the chart annexed hereto as Exhibit "10."

456. East Pearl, Qiu, and the Management Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through East Pearl that were not compensable under the No-Fault Laws.

457. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $469,000.00 pursuant to the fraudulent bills submitted by the Defendants through East Pearl.

458. The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

459. Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**TWENTY-FIFTH CAUSE OF ACTION**
**Against East Pearl, Qiu, and the Management Defendants**
**(Unjust Enrichment)**

460. GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

461. As set forth above, East Pearl, Qiu, and the Management Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

462. When GEICO paid the bills and charges submitted by or on behalf of East Pearl for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

463.    East Pearl, Qiu, and the Management Defendants have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

464.    Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

465.    By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $469,000.00.

## TWENTY-SIXTH CAUSE OF ACTION
### Against Xu Gao Acu, Gao, and the Management Defendants
### (Common Law Fraud)

466.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

467.    Xu Gao Acu, Gao, and the Management Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services.

468.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Xu Gao Acu was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact it was actually owned and controlled by unlicensed laypersons; (ii) in every claim, the representation that Xu Gao Acu was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact the professional corporation engaged in illegal fee-splitting with unlicensed laypersons; (iii) in every claim, the representation that the billed-for services

were medically necessary and properly billed in accordance with the Fee Schedule, when in fact the billed-for services were not medically necessary, were performed and billed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants; and (iv) in every claim, the representation that the charges were appropriate and consistent with the service provided, when in fact the charges exaggerated the level of service and the nature of the service that purportedly was provided. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO are described in the chart annexed hereto as Exhibit "11."

469.    Xu Gao Acu, Gao and the Management Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Xu Gao Acu that were not compensable under the No-Fault Laws.

470.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $276,000.00 pursuant to the fraudulent bills submitted by the Defendants through Xu Gao Acu.

471.    The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

472.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### TWENTY-SEVENTH CAUSE OF ACTION
**Against Xu Gao Acu, Gao, and the Management Defendants**
**(Unjust Enrichment)**

473.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

474.   As set forth above, Xu Gao Acu, Gao, and the Management Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

475.   When GEICO paid the bills and charges submitted by or on behalf of Xu Gao Acu for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

476.   Xu Gao Acu, Gao and the Management Defendants have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

477.   Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

478.   By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $276,000.00.

## TWENTY-EIGHTH CAUSE OF ACTION
### Against Global Health, Granovsky, and the Management Defendants
### (Common Law Fraud)

479.   GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

480.   Global Health, Granovsky, and the Management Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services.

481.   The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Global Health was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law §

5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact it was actually owned and controlled by unlicensed laypersons; (ii) in every claim, the representation that Global Health was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact the professional corporation engaged in illegal fee-splitting with unlicensed laypersons; (iii) in every claim, the representation that the billed-for services were medically necessary and properly billed in accordance with the Fee Schedule, when in fact the billed-for services were not medically necessary and were performed and billed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants; and (iv) in every claim, the representation that the charges were appropriate and consistent with the service provided, when in fact the charges exaggerated the level of service and the nature of the service that purportedly was provided. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO are described in the chart annexed hereto as Exhibit "12."

482.   Global Health, Granovsky, and the Management Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Global Health that were not compensable under the No-Fault Laws.

483.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $73,000.00 pursuant to the fraudulent bills submitted by the Defendants through Global Health.

484.   The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

485.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## TWENTY-NINTH CAUSE OF ACTION
### Against Global Health, Granovsky, and the Management Defendants
### (Unjust Enrichment)

486.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

487.    As set forth above, Global Health, Granovsky, and the Management Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

488.    When GEICO paid the bills and charges submitted by or on behalf of Global Health for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

489.    Global Health, Granovsky, and the Management Defendants have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

490.    Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

491.    By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $73,000.00.

## THIRTIETH CAUSE OF ACTION
### Against Granovsky and the Management Defendants
### (Common Law Fraud)

492.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

493.   Granovsky and the Management Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services in connection with the Fraudulent Granovsky Practice.

494.   The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that the Fraudulent Granovsky Practice was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact it was actually controlled by unlicensed laypersons; (ii) in every claim, the representation that the Fraudulent Granovsky Practice was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact it engaged in illegal fee-splitting with unlicensed laypersons; and (iii) in every claim, the representation that the billed-for services were medically necessary and properly billed in accordance with the Fee Schedule, when in fact the billed-for services were performed and billed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO are described in the chart annexed hereto as Exhibit "13."

495.   Granovsky and the Management Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through the Fraudulent Granovsky Practice that were not compensable under the No-Fault Laws.

496.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $232,000.00 pursuant to the fraudulent bills submitted by the Defendants through the Fraudulent Granovsky Practice.

497.     The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

498.     Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**THIRTY-FIRST CAUSE OF ACTION**
**Against Granovsky and the Management Defendants**
**(Unjust Enrichment)**

499.     GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

500.     As set forth above, Granovsky and the Management Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO in connection with the Fraudulent Granovsky Practice.

501.     When GEICO paid the bills and charges submitted by or on behalf of the Fraudulent Granovsky Practice for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

502.     Granovsky and the Management Defendants have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

503.     Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

504.     By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $232,000.00.

### THIRTY-SECOND CAUSE OF ACTION
**Against Dr. Ajudia, Utica Comprehensive, Dr. Kelly, Effective Healthcare, Dr. Dublin, BD Medical, Granovsky, Global Health, Bishay, GS PT, Bigley, Super AM, Ahmed, Habiba Care, Qiu, East Pearl, Gao, Mahmoud, Vison Rehab, Lurie, Farberov, and John Doe Defendants 1-10**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

505.     GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

506.     Dr. Ajudia, Utica Comprehensive, Dr. Kelly, Effective Healthcare, Dr. Dublin, BD Medical, Granovsky, Global Health, Bishay, GS PT, Bigley, Super AM, Ahmed, Habiba Care, Qiu, East Pearl, Gao, Mahmoud, Vison Rehab, the Fraudulent Ajudia Practice, Fraudulent Kelly Practice, Fraudulent Granovsky Practice, Lurie, Farberov, and John Doe Defendants 1-10 constitute an association-in-fact "enterprise" (the "Utica Avenue Enterprise") as that term is defined in 18 U.S.C. § 1961(4), that engages in, and the activities of which affect, interstate commerce.

507.     The members of the Utica Avenue Enterprise are and have been associated through time, joined in purpose and organized in a manner amenable to hierarchal and consensual decision making, with each member fulfilling a specific and necessary role to carry out and facilitate its common purpose. Specifically: (i) Lurie, Farberov, and John Doe Defendants 1-10 are laypersons who provided the idea, financing, and operational management necessary to carry out the fraudulent scheme, including "buying" the licenses of healthcare professionals and directing a fraudulent, predetermined treatment protocol to wrongfully obtain monies from insurance companies by exploiting Insured's no-fault insurance benefits; (ii) Dr. Ajudua, Dr. Kelly, Dr. Dublin, Granovsky, Bishay, Bigley, Ahmed, Qiu, Gao, and Mahmoud are

105

the professionals who knowingly sold the use of their professional licenses so that Utica
Comprehensive, Effective Healthcare, BD Medical, Global Health, GS PT, Super AM, Habiba
Care, East Pearl, Xu Gao Acu, Vison Rehab, the Fraudulent Ajudua Practice, the Fraudulent
Kelly Practice, and the Fraudulent Granovksy Practice could be fraudulently controlled and used
to further the fraudulent, predetermined treatment protocol, and these professionals knowingly
purported to serve as the owners and operators of the professional corporations and private
practices in order to provide a patina of legitimacy to the Defendants' fraudulent scheme; (iii)
Utica Comprehensive, Effective Healthcare, BD Medical, Global Health, GS PT, Super AM,
Habiba Care, East Pearl, Xu Gao Acu, Vison Rehab, the Fraudulent Ajudua Practice, Fraudulent
Kelly Practice, and Fraudulent Granovksy Practice ostensibly are independent entities, with
different names and tax identification numbers, that were created as vehicles to achieve a
common purpose – namely, to facilitate the submission of fraudulent charges to GEICO and
other insurers from a single medical clinic in Brooklyn, New York.   The Utica Avenue
Enterprise has been operated under multiple names in order to reduce the number of bills
submitted under any individual name, in an attempt to avoid attracting the attention and scrutiny
of GEICO and other insurers to the volume of billing and the pattern of fraudulent charges
originating from any one company. Accordingly, the carrying out of this scheme would be
beyond the capacity of each member of the Utica Avenue Enterprise acting singly or without the
aid of each other.

508.    The Utica Avenue Enterprise is distinct from and has an existence beyond the
pattern of racketeering that is described herein, namely by recruiting, employing, overseeing, and
coordinating many professionals and non-professionals who have been responsible for
facilitating and performing a wide variety of administrative and professional functions beyond

the acts of mail fraud (i.e., the submission of the fraudulent bills to GEICO and other insurers), by creating and maintaining patient files and other records, by recruiting and supervising personnel, by negotiating and executing various billing and collection agreements, facility lease agreements, equipment lease agreements and management agreements, by maintaining the bookkeeping and accounting functions necessary to manage the receipt and distribution of the insurance proceeds, and by retaining collection lawyers whose services also were used to generate payments from insurance companies to support all of the aforesaid functions.

509.    Dr. Ajudua, Utica Comprehensive, Dr. Kelly, Effective Healthcare, Dr. Dublin, BD Medical, Granovsky, Global Health, Bishay, GS PT, Bigley, Super AM, Ahmed, Habiba Care, Qiu, East Pearl, Gao, Mahmoud, Vison Rehab, the Fraudulent Ajudua Practice, the Fraudulent Kelly Practice, the Fraudulent Granovsky Practice, Lurie, Farberov, and John Doe Defendants 1-10 each were employed by and/or associated with the Utica Avenue Enterprise.

510.    Dr. Ajudua, Utica Comprehensive, Dr. Kelly, Effective Healthcare, Dr. Dublin, BD Medical, Granovsky, Global Health, Bishay, GS PT, Bigley, Super AM, Ahmed, Habiba Care, Qiu, East Pearl, Gao, Mahmoud, Vison Rehab, the Fraudulent Ajudua Practice, the Fraudulent Kelly Practice, the Fraudulent Granovsky Practice, Lurie, Farberov, and John Doe Defendants 1-10 knowingly have conducted and/or participated, directly or indirectly, in the conduct of the Utica Avenue Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent bills on a continuous basis for over two years seeking payments that Utica Comprehensive, Effective Healthcare, BD Medical, Global Health, GS PT, Super AM, Habiba Care, East Pearl, Vison Rehab, the Fraudulent Ajudua Practice, the Fraudulent Kelly Practice, and the Fraudulent Granovsky Practice were not

eligible to receive under the No-Fault Laws because: (i) they were unlawfully owned and controlled by unlicensed physicians; (ii) they engaged in fee-splitting with unlicensed physicians; (iii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; and (iv) the billed-for-services were not medically necessary. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the charts annexed hereto as Exhibits "1-13."

511. The Defendants submitted the fraudulent billing, or caused it to be submitted, on a continuous basis for more than two years. Furthermore, this pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, inasmuch as the Defendants are attempting collection on the fraudulent billing to the present day. Moreover, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity.

512. The Utica Avenue Enterprise's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Dr. Ajudua, Utica Comprehensive, Dr. Kelly, Effective Healthcare, Dr. Dublin, BD Medical, Granovsky, Global Health, Bishay, GS PT, Bigley, Super AM, Ahmed, Habiba Care, Qiu, East Pearl, Gao, Mahmoud, Vison Rehab, the Fraudulent Ajudua Practice, the Fraudulent Kelly Practice, the Fraudulent Granovsky Practice, Lurie, Farberov, and John Doe Defendants 1-10 operate the Utica Avenue Enterprise, insofar as Utica Comprehensive, Effective Healthcare, BD Medical, Global Health, GS PT, Super AM, Habiba Care, East Pearl, Vison Rehab, the Fraudulent Ajudua Practice, the Fraudulent Kelly Practice, and the Fraudulent

Granovsky Practice never have been eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore are essential in order for the Utica Avenue Enterprise to function.

513.    The Utica Avenue Enterprise is engaged in inherently unlawful acts, inasmuch as it has fraudulently owned and controlled professional corporations and professional practices through continuing misrepresentations made to the New York State Department of Education and the New York State Department of State. The Utica Avenue Enterprise used these fraudulently incorporated and/or illegally owned and controlled professional corporations and practices as vehicles to submit large-scale fraudulent billing to GEICO and other insurers. These inherently unlawful acts are taken by the Utica Avenue Enterprise in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

514.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $2,610,000.00 pursuant to the fraudulent bills submitted by the Defendants through Utica Comprehensive, Effective Healthcare, BD Medical, Global Health, GS PT, Super AM, Habiba Care, East Pearl, Vison Rehab, the Fraudulent Ajudua Practice, the Fraudulent Kelly Practice, and the Fraudulent Granovsky Practice.

515.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

**THIRTY-THIRD CAUSE OF ACTION**
**Against Dr. Ajudua, Utica Comprehensive, Dr. Kelly, Effective Healthcare, Dr. Dublin, BD**
**Medical, Granovsky, Global Health, Bishay, GS PT, Bigley, Super AM, Ahmed, Habiba**
**Care, Qiu, East Pearl, Gao, Mahmoud, Vison Rehab, Lurie, Farberov, and John Doe**
**Defendants 1-10**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

516.     GEICO incorporates, as though fully set forth herein, each and every allegation in

the paragraphs set forth above.

517.     Dr. Ajudua, Utica Comprehensive, Dr. Kelly, Effective Healthcare, Dr. Dublin, BD

Medical, Granovsky, Global Health, Bishay, GS PT, Bigley, Super AM, Ahmed, Habiba Care,

Qiu, East Pearl, Gao, Mahmoud, Vison Rehab, the Fraudulent Ajudua Practice, the Fraudulent

Kelly Practice, the Fraudulent Granovsky Practice, Lurie, Farberov, and John Doe Defendants 1-10

knowingly have agreed, combined and conspired to conduct and/or participate, directly or

indirectly, in the conduct of the Utica Avenue Enterprise's affairs, through a pattern of

racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C.

§ 1341, based upon the use of the United States mails to submit hundreds of fraudulent bills to

GEICO.  These acts of mail fraud include, but are not limited to, those that are described in the

charts annexed hereto as Exhibits "1-13."

518.     Each member of the Utica Avenue Enterprise knew of, agreed to and acted in

furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of

money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

519.     GEICO has been injured in its business and property by reason of the above-

described conduct of Dr. Ajudua, Utica Comprehensive, Dr. Kelly, Effective Healthcare, Dr.

Dublin, BD Medical, Granovsky, Global Health, Bishay, GS PT, Bigley, Super AM, Ahmed,

Habiba Care, Qiu, East Pearl, Gao, Mahmoud, Vison Rehab, the Fraudulent Ajudua Practice, the

Fraudulent Kelly Practice, the Fraudulent Granovsky Practice, Lurie, Farberov, and John Doe

110

Defendants 1-10 in that it has paid at least $2,610,000.00 pursuant to the fraudulent bills submitted by the Defendants through Utica Comprehensive, Effective Healthcare, BD Medical, Global Health, GS PT, Super AM, Habiba Care, East Pearl, Vison Rehab, the Fraudulent Ajudua Practice, the Fraudulent Kelly Practice, and the Fraudulent Granovsky Practice.

520.   By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## JURY DEMAND

521.   Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

**WHEREFORE**, Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company, and GEICO Casualty Company demand that a Judgment be entered in their favor:

A.   On the First Cause of Action against the Defendants, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that the Provider Defendants have no right to receive payment for any pending bills submitted to GEICO;

B.   On the Second Cause of Action against Dr. Ajudua and the Management Defendants, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $162,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

C.   On the Third Cause of Action against Dr. Ajudua and the Management Defendants, compensatory damages in favor of GEICO an amount to be determined at trial but in

excess of $162,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

      D.      On the Fourth Cause of Action against Utica Comprehensive, Dr. Ajudua, and the Management Defendants, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $162,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

      E.      On the Fifth Cause of Action against Utica Comprehensive, Dr. Ajudua, and the Management Defendants, more than $162,000.00 for unjust enrichment, plus costs and interest and such other and further relief as this Court deems just and proper;

      F.      On the Sixth Cause of Action against Dr. Ajudua and the Management Defendants, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $94,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

      G.      On the Seventh Cause of Action against Dr. Ajudua and the Management Defendants, more than $94,000.00 for unjust enrichment, plus costs and interest and such other and further relief as this Court deems just and proper;

      H.      On the Eighth Cause of Action against Dr. Kelly and the Management Defendants, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $117,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

      I.      On the Ninth Cause of Action against Dr. Kelly and the Management Defendants, more than $117,000.00 for unjust enrichment, plus costs and interest and such other and further relief as this Court deems just and proper;

J.      On the Tenth Cause of Action against Effective Healthcare, Dr. Kelly and the Management Defendants, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $114,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

K.      On the Eleventh Cause of Action against Effective Healthcare, Dr. Kelly and the Management Defendants, more than $114,000.00 for unjust enrichment, plus costs and interest and such other and further relief as this Court deems just and proper;

L.      On the Twelfth Cause of Action against BD Medical, Dr. Dublin and the Management Defendants, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $68,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

M.      On the Thirteenth Cause of Action against BD Medical, Dr. Dublin and the Management Defendants, more than $68,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

N.      On the Fourteenth Cause of Action against GS PT, Bishay and the Management Defendants, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $169,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

O.      On the Fifteenth Cause of Action against GS PT, Bishay and the Management Defendants, more than $169,000.00 in unjust enrichment, plus costs and interest and such other and further relief as this Court deems just and proper;

P.      On the Sixteenth Cause of Action against Habiba Care, Ahmed and the Management Defendants, compensatory damages in favor of GEICO an amount to be determined

113

at trial but in excess of $152,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

Q.    On the Seventeenth Cause of Action against Habiba Care, Ahmed and the Management Defendants, more than $152,000.00 for unjust enrichment, plus costs and interest and such other and further relief as this Court deems just and proper;

R.    On the Eighteenth Cause of Action against Mahmoud and the Management Defendants, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $534,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

S.    On the Nineteenth Cause of Action against Mahmoud and the Management Defendants, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $534,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

T.    On the Twentieth Cause of Action against Vision Rehab, Mahmoud and the Management Defendants, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $534,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

U.    On the Twenty-First Cause of Action against Vision Rehab, Mahmoud and the Management Defendants, more than $534,000.00 for unjust enrichment, plus costs and interest and such other and further relief as this Court deems just and proper;

V.    On the Twenty-Second Cause of Action against Super AM, Bigley and the Management Defendants, compensatory damages in favor of GEICO an amount to be determined

at trial but in excess of $162,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

W.    On the Twenty-Third Cause of Action against Super AM, Bigley and the Management Defendants, more than $162,000.00 for unjust enrichment, plus costs and interest and such other and further relief as this Court deems just and proper;

X.    On the Twenty-Fourth Cause of Action against East Pearl, Qiu and the Management Defendants, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $469,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

Y.    On the Twenty-Fifth Cause of Action against East Pearl, Qiu and the Management Defendants, more than $469,000.00 for unjust enrichment, plus costs and interest and such other and further relief as this Court deems just and proper;

Z.    On the Twenty-Sixth Cause of Action against Xu Gao Acu, Gao and the Management Defendants, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $276,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

AA.    On the Twenty-Seventh Cause of Action against Xu Gao Acu, Gao and the Management Defendants, more than $276,000.00, for unjust enrichment, plus costs and interest and such other and further relief as this Court deems just and proper;

BB.    On the Twenty-Eighth Cause of Action against Global Health, Granovsky and the Management Defendants, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $73,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

CC.     On the Twenty-Ninth Cause of Action against Global Health, Granovsky, and the Management Defendants, more than $73,000.00 for unjust enrichment, plus costs and interest and such other and further relief as this Court deems just and proper;

DD.     On the Thirtieth Cause of Action against Granovsky and the Management Defendants, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $232,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

EE.     On the Thirty-First Cause of Action against Granovsky and the Management Defendants, more than $232,000.00 for unjust enrichment, plus costs and interest and such other and further relief as this Court deems just and proper.

FF.     On the Thirty-Second Cause of Action against Dr. Ajudua, Utica Comprehensive, Dr. Kelly, Effective Healthcare, Dr. Dublin, BD Medical, Granovsky, Global Health, Bishay, GS PT, Bigley, Super AM, Ahmed, Habiba Care, Qiu, East Pearl, Gao, Mahmoud, Vison Rehab, Lurie, Farberov, and John Doe Defendants 1-10, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $2,610,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

GG.     On the Thirty-Third Cause of Action against Dr. Ajudua, Utica Comprehensive, Dr. Kelly, Effective Healthcare, Dr. Dublin, BD Medical, Granovsky, Global Health, Bishay, GS PT, Bigley, Super AM, Ahmed, Habiba Care, Qiu, East Pearl, Gao, Mahmoud, Vison Rehab, Lurie, Farberov, and John Doe Defendants 1-10, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $2,610,000.00, together with treble damages,

costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest.

Dated: September 3, 2015

RIVKIN RADLER LLP

By: _____
      Michael A. Sirignano (MS 5263)
      Barry I. Levy (BL 2190)
      Frank P. Tiscione (FT 5396)
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000
*Counsel for Plaintiffs Government Employees*
*Insurance Company, GEICO Indemnity Company,*
*GEICO General Insurance Company, and GEICO*
*Casualty Company*

3119315

117